UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT
OF TENNESSEE

_____

| | |
|---|---|
| MATTHEW B., BY AND THROUGH HIS REPRESENTATIVE AND PARENT, G.F. AND B.B.<br><br>PLAINTIFFS.<br><br>vs.<br><br>CLARKSVILLE-MONTGOMERY COUNTY SCHOOL SYSTEM,<br><br>DEFENDANT. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>) No: _____<br>)<br>)<br>)<br>)<br>)<br>) |

_____

# COMPLAINT

_____

**COMES THE PLAINTIFF, Matthew B.,** through his parent and guardians, G.F. and B.B. They show:

### I. INTRODUCTION

1. This case presents an indictment of indifference by the Clarksville Montgomery County School System and the Tennessee Division of Special Education regarding a student with dyslexia.

2. For *nine years,* Matthew B.'s need for dyslexia-specific supports ("specially designed instruction" under the IDEA) were ignored. He was literally passed from grade to grade

to grade to grade to grade to grade to grade to grade to grade—nine grades—without being taught to read with the appropriate instruction for his dyslexia.

3. By fourth grade, Matthew's teacher proclaimed him to be a situation of "learned helplessness." Teachers decried him as "totally frustrated" and "dependent on adults." Even by *ninth grade,* a teacher wrote "the student doesn't know his sight words." And in tenth grade a teacher wrote: "Honestly I haven't had a kid this bad at reading before." Yet he was passed along for nine years without appropriate dyslexia evaluations, identification, or supports.

4. Matthew's situation was so dire that, after an eventual evaluation, its school psychologist in high school wrote, "this student has been failed by our system...."[1] Even the school psychologist recognized it was too late—"extremely unreasonable"—for Matthew to close the reading gap in high school.

5. The Tennessee Division of Special Education was little better. When Matthew brought a Due Process action under the IDEA seeking remedies to include the necessary compensatory education, the state-appointed hearing officer found that a statute of limitations barred his claim for all of the first nine years. The hearing officer instead asked whether his tenth grade IEP was sufficient for the damage which CMCSS had done. Finding it was sufficient for a first grader, the hearing officer dismissed the case. Even when Petitioners explained in a request for reconsideration how the hearing officer misunderstood the applicable statute of limitations, the hearing officer refused to concede the obvious error.

6. CMCSS was rewarded for its failure to teach Matthew to read in elementary school, middle school, and high school. Matthew now appeals under the IDEA.

---

[1] Final Order, Finding of Fact No. 16.

## II. PARTIES, JURISDICTION, AND VENUE

7. Matthew B. ("Matthew") resides with his father, B.B., in Clarksville, Tennessee. G.F., his representative, has power of attorney concerning matters of his education.

8. The Clarksville Montgomery County School System (CMCSS) is the educational entity providing a public education to students residing in Clarksville-Montgomery County, such as Matthew. It receives federal funding and must provide special education to persons like Matthew who are eligible students under the IDEA.

9. This action arises under the Individuals with Disabilities Education Act (IDEA), 20 U.S.C. §§ 1400 *et seq.* Jurisdiction is conferred upon this Court by the Individuals with Disabilities Education Act (IDEA), 20 U.S.C. §§ 1415(i)(2)(A) and 1415(i)(3)(A), which provide district courts of the United States with jurisdiction over any action brought under the IDEA, without regard to the amount in controversy.

10. Venue is appropriate in this Court pursuant to 28 U.S.C. § 1391(b), as Plaintiff resides within the Middle District of Tennessee and all events and omissions giving rise to this Complaint occurred in Clarksville-Montgomery County, within this judicial district.

11. Administrative exhaustion occurred through a state due process hearing with a Final Order by Administrative Law Judge Michael T. Begley dated July 6, 2022. This appeal is timely, brought within sixty (60) days thereafter.

### III. FACTS

#### A. Matthew's Reading Limitations Were Known, But Not Addressed, in the Early Elementary School Years

12. Matthew first enrolled in CMCSS for Kindergarten during the 2009-2010 school year.

13. That year, he was given a "DIBELS screener" to assess his reading fluency. This screener classified him as at risk in several categories. Matthew would repeat Kindergarten in 2010-2011.[2] But in neither year was he given a comprehensive evaluation for dyslexia.

14. In first grade, 2011-2012, CMCSS did evaluate Matthew. Patti Wilson, a CMCSS school psychologist, found that he qualified for special education under the eligibility categories of "specific learning disability" (SLD) and under "other health impairment" (OHI).

15. In a move that impact Matthew's future, Ms. Wilson suggested that OHI rather than SLD may be "the most appropriate category."[3] While Ms. Wilson, herself, understood that Matthew *also* had a specific learning disability, Matthew's first grade IEP only listed OHI as his primary disability, and *"none" as his secondary disability*. Thus, OHI for attention deficit disorder (ADD) became the *only category* listed on Matthew's IEP.[4]

16. This OHI-only designation remained true all the way through high school. Consequently, by high school, even Matthew's special education teacher, Ms. Purdy, did not know or understand that Matthew had dyslexia too.[5]

---

[2] Final Order, Finding of Fact ("FF")

[3] Final Order, FF 2.

[4] Final Order, FF 3.

[5] Final Order, FF 3-4.

17. While it is true that a child may receive interventions for a disability that is not actually listed on the child's IEP, this most certainly was *not* the case for Matthew.

18. For Matthew to learn to read, he required specially designed instruction for his type of dyslexia, not simply typical accommodations for ADD.

19. Matthew has the most severe type of dyslexia, known as "mixed dyslexia presentation," or "mixed-type," which is a devastating combination of both phonetic and orthographic disorders. Generally, phonetic difficulties involve understanding the relationship between the letters and sounds, blending them, and taking them apart. Orthographic difficulties involve recognition of sight words.

20. To have *both* phonetic and orthographic limitations is extremely difficult. To learn to read, it requires a reasonable modification—kinesthetics—an engagement of multiple senses like touch, feel, and use of manipulatives (e.g. moving the hands of a clock, shaping letters with Play-doh, drawing, moving while learning, spelling in the "air"). And these must be delivered by someone trained in multi-sensory techniques for dyslexia, something Matthew did not receive.

### B. Fourth Grade: Learned Helplessness and Total Frustration

21. By fourth grade, Matthew's teachers noted he exhibited "learned helplessness." His teacher notes include statements such as, "Matthew has a very difficult time with decoding written materials," and "Matthew is totally frustrated and has become very dependent on adults to 'help' him."[6]

22. At his due process hearing, both CMSS's dyslexia specialist, Sarah McAfee, and Matthew's dyslexia expert witness, Megan Pinchback, explained that, by fourth grade, CMSS

---

[6] Final Order, FF 5.

5

should have *reevaluated* Matthew because he was not making progress, could not read, and had very low scores.[7] In other words, the data and signs were clearly present.

23. Ms. Pinchback explained that, while ADD exists with dyslexia up to 50% of the time, they are separate impairments and serving a child's ADD-related needs alone would result in "no growth" for reading.[8] Had Matthew actually been provided the necessary *dyslexia* interventions through his IEP, he would have been a functional reader by fourth grade.[9] Instead, Matthew could not read at all.

### C. Middle School: M.B. Can Only Read A Few Words

24. By sixth and seventh grades, teachers were remarking of Matthew's illiteracy. Teachers notes from Matthew's sixth and seventh grade years included the following statements: "The student can't read. The student doesn't know his sight words and he cannot decode," and "fluency is a big problem. He can only read a few words."[10]

25. Despite his inability to read, CMCSS continued to pass Matthew along. It passed him in fifth, sixth, and seventh grades, even though he could decipher barely any words. And it still did not provide him dyslexia specific instruction.

---

[7] Final Order, FF 6.

[8] Final Order, FF 7.

[9] Final Order, FF 8.

[10] Final Order, FF 10.

6

26. In eighth grade, Matthew was not even on a first-grade reading level. He was not meeting his target growth factor. In fact, he was progressing at a *negative* (-2.00) rate of improvement.[11]

### D. High School: CMCSS's School Psychologist Says "This Student Has Been Failed by Our System"

27. In Matthew's ninth grade year, 2019-2020, his representative, G.F., requested an evaluation of Matthew for dyslexia and other impairments. The representative thus demanded what CMCSS teachers and staff should have done so long ago—evaluate!

28. Beginning the second semester of ninth grade, January 2020, CMCSS's school psychologist, Ms. Megan Christensen, performed the evaluation. She found Matthew had a low average IQ and poor reading scores. She found he could not sound out or recognize basic sight words.

29. Ms. Christenson found that Matthew had "mixed dyslexia presentation," with complex difficulties that are both phonetic and orthographic. Mixed dyslexia presentation is the most severe form of reading disability.[12]

30. Generally, phonetic difficulties involve understanding the relationship between the letters and sounds, blending them, and taking them apart. Orthographic difficulties involve recognition of sight words. Matthew, as mentioned, had both types simultaneously.

31. Ms. Christensen found that Matthew was reading at a first-grade level, despite his motivation to learn to read. She sounded an alarm of failure within CMCSS with respect to

---

[11] September 5, 2018 IEP, Ex. 68xvi, pp. 3-4.

[12] Final Order, FF 14.

7

Matthew's education: "**general education/special education, this student has been failed by our system**...."[13] She recommended both Specific Learning Disability (SLD) and Other Health Impairment (OHI) for Matthew's IEP.[14]

32. Ms. Christensen monitored Matthew's performance during his 2020-2021 tenth-grade year. She found substantial gaps in reading and math, such that she concluded it was an "extremely unreasonable" gap to close in high school. One of Matthew's tenth grade teachers even commented, "Honestly I haven't had a kid this bad at reading before."[15]

33. CMCSS employed a dyslexia specialist, Ms. Sara McAfee, to work with students and teachers on matters of dyslexia. She was the only one in such position.

34. Ms. Christensen reached out to Ms. McAfee, the dyslexia specialist for CMCSS, to help Matthew. G.F. also requested that Ms. McAfee work with him.

35. Inexcusably, CMCSS blocked its own dyslexia specialist, Ms. McAfee, from working with Matthew. It falsely claimed she does not provide "direct instruction" to students when, in fact, she does.[16] Additionally, CMCSS claimed Ms. McAfee had a "conflict of interest" because her step-son once dated Matthew's sister—as if that would affect her ability to teach Matthew to read. CMSS did not bring in another dyslexia specialist to work with Matthew.

36. Instead of a dyslexia specialist, CMCSS used Ms. Purdy Erin, Matthew's high school teacher, whom Matthew and his parent admittedly liked. However, Ms. Purdy is not a

---

[13] Final Order, FF 16.

[14] Final Order, FF 17.

[15] Final Order, FF 18.

[16] Final Order, FF 21.

dyslexia specialist and she had not received any dyslexia specific training prior to working with Matthew. In fact, to the point that Matthew was re-evaluated, Ms. Purdy, who was Matthew's teacher, did not know or recognize that Matthew even had dyslexia and needed dyslexia interventions.[17]

37. In high school, when Ms. Purdy began working with Matthew on his reading, he was working on "beginning steps of reading"—his "sight words."[18] A simple comparison of CMCSS's own psychological evaluations from first grade to ninth grade reflect nearly identical present achievement levels in the area of reading (the less than 1st percentile), never advancing past the first grade level.[19] This illustrates just how *little to no progress* Matthew had obtained in his ability to read, despite being passed from grade to grade for over *eight years* with an IEP for his ADD under the OHI category.

38. At the due process, the ALJ inexplicably found that Ms. Purdy underwent training on the Orton-Gillingham methodology for teaching students with dyslexia.[20] She most certainly did not. CMCSS's sworn discovery responses show that *none* of its personnel working with Matthew in the 2019-2020 and 2020-2021 school years, Ms. Purdy included, received any dyslexia

---

[17] Purdy, Vol. III, pp. 536-38; Final Order, FF 4.

[18] Final Order, FF 24.

[19] *Compare* Ex. 15, February 27, 2012 Psychological Evaluation (showing composite current reading achievement skills in the less than 1st percentile of his same age then first-grade peers *with* Ex. 37, February 26, 2020 Psychological Evaluation (showing all categories of current reading achievement at a less than 1st percentile with grade equivalency in the first-grade level).

[20] Final Order, FF 25.

specific training.[21] And, as mentioned, Matthew had the most severe form of dyslexia—mixed type.[22]

39. Without adequate training and experience with dyslexia, it was not fair to Ms. Purdy or to Matthew for CMCSS to ask her to teach Matthew to read. Even at the due process hearing, Ms. Purdy did not know what is meant by orthographic or phonemic dyslexia. She lacks any specific reading certifications as she is mainly a math teacher. It was not until the fall of 2021, tenth grade, that Ms. Purdy actually undertook a one-day "training" on dyslexia interventions, after being told to find a "kit in the building." Again, until the ninth-grade evaluation, Ms. Purdy never considered dyslexia or SLD for Matthew because dyslexia was not on his IEP and, according to Ms. Purdy, she sees *lots of students in the one percentile (1%) of reading in 9th grade*.

40. Since March 2021, Matthew has been working with a private tutor, Teresa Avera, who is trained in a dyslexia specific methodology ("Orton Gillingham"). Matthew has been working four to five days per week for five to six hours per day on completing his homeschool instruction and learning to read.[23]

41. Even so, Ms. Christenson and Ms. Pinchback are correct that "closing the gap" is unrealistic in high school. Plaintiffs' dyslexia expert, Ms. Pinchback, determined that it would take 3.5-4 years to remediate Matthew's reading through a "Certified Academic Language Therapy

---

[21] CMCSS Responses to Interrogatories, Ex. 7, Interrogatory No. 4, Excel Sheet Attachment 1 and 4).

[22] Ms. Purdy also admitted she did not talk to any of Matthew's prior teachers, did not look at any materials he worked on the year prior, did not inquire what techniques had been used previously with him, and did not even know what type of dyslexia Matthew has, or even what the different types of dyslexia are (orthographic and phonemic, with Matthew having both types). Final Order, FF 25; Purdy, Vol. III, pp. 531-33.

[23] Final Order, FF 29.

Association" for Matthew to become a "functional reader," capable of reading road signs, prescription bottles, filling out job applications, etc.

42. At the due process hearing, Matthew's father said that he recently sounded out the word "Tundra" on the back of a pickup truck, asking if that was correct, and being proud of getting it correct.

**IV. ALJ ERRORS AT DUE PROCESS HEARING/ LEGAL CLAIMS**

43. The hearing officer, an administrative law judge (ALJ), committed the following fatal errors.

**A. The ALJ Considered the Wrong Years for Denial of FAPE and Child Find**

44. First, the ALJ considered the wrong years in connection with the denial of FAPE and/or Child Find. This case involves CMCSS's *eight-year* failure to re-evaluate Matthew—from first grade to ninth grade, as demonstrated in the graphic below.

| School Year | Grade | Evaluated for Dyslexia Interventions? |
|---|---|---|
| 2009-2010 | Kindergarten | N |
| 2010-2011 | Kindergarten (repeat) | N |
| 2011-2012 | First Grade | Y (First Evaluation) – but no dyslexia specific interventions given |
| 2012-2013 | Second Grade | N |
| 2013-2014 | Third Grade | N |
| 2014-2015 | Fourth Grade | N |
| 2015-2016 | Fifth Grade | N |
| 2016-2017 | Sixth Grade | N |
| 2017-2018 | Seventh Grade | N |
| 2018-2019 | Eighth Grade | N |
| 2019-2020 | Ninth Grade | Y (Second Evaluation) |
| 2020-2021 | Tenth Grade | N/A |
| 2021-2022 | Eleventh Grade | N/A |

11

45. When he was still not progressing in his reading abilities, Matthew should have been evaluated at least by fourth grade, and certainly by fifth, sixth, seventh, and eighth grades. However, as shown above, Matthew was not evaluated in *any* of these years. The failure to do so denied him both FAPE and constituted a violation of Child Find. Instead of being a functional reader had he been evaluated in fourth grade and provided appropriate services, he is just now beginning basic reading functions.

46. The ALJ mistakenly ruled out all of CMCSS's failures in both elementary school (through fourth grade) and all of middle school too (through eighth grade). The ALJ wrote: "Whether M.B.'s IEPs in middle or elementary school provided him with a FAPE cannot be considered as they are outside of the statutory period." (Final Order, p. 15).

47. They are not. The IDEA employs the discovery rule such that the *entire period* of the deprivation must be considered if Petitioners filed within two years of "discovering" the deprivations. They did.

48. The undisputed testimony showed that Matthew's father first learned *in 2020* that Matthew was denied the appropriate supports for dyslexia since elementary school. By this point, Matthew had been passed from grade to grade, with the eight-year gap in evaluations, and was so far behind at this juncture, and so in need of additional help, that even CMCSS personnel believed it was an "extremely unreasonable" gap to close in high school.[24] Accordingly, the entire deprivation was within the "statutory period."

---

[24] Christensen, Vol. I, pp. 58-64; 21.1.20 Email from Christensen and Wilson, Ex. 62) (requiring up to 185 weeks of intervention to address some gaps).

49. Nonetheless, the ALJ mistakenly found that those years are "outside of the statutory period." (Final Order, p. 15). The ALJ did not even consider eighth and ninth grade, admittedly only considering matters "during the 2020-2021 school year" of tenth grade. (Final Order, p. 1).

50. Second, even if one *ignored* the discovery rule and merely employed a strict two-year lookback from the date of due process filing on February 3, 2021, the ALJ failed to do even that. On February 3, 2021, the date of due process filing, Matthew was in tenth grade. A two-year look-back, to February 3, 2019, would place M.B. in eighth-grade middle school. At that point, he had been passed year after year and was still only on a first-grade reading level. There is no dispute that Matthew was not evaluated in eighth grade (the last was in *first grade*), even though he barely knew sight words and was actually *regressing*. But the ALJ refused to even consider it.

**B. The ALJ Failed to Address Additional Time and Compensatory Needs**

51. Second, and relatedly, the ALJ improperly determined that an IEP created in tenth grade, with no provision for additional time like compensatory education, was somehow appropriate for this profound multi-year denial of FAPE.

52. Matthew's tenth grade IEP, 2020-2021, did not address how Matthew's gap was so great that even CMCSS believed it was "extremely unreasonable" to close in high school.[25] He obviously required additional time devoted to dyslexia-specific instruction.

53. Matthew required an IEP that provides him with intensive dyslexia-specific instruction, including time such as compensatory education, approximately 3.5 years of such

---

[25] See Footnote 24.

13

remediation, such as through a certified academic language therapist or person of similar dyslexia-specific training credentials.

54. However, CMCSS intentionally blocked its dyslexia specialist from working with Matthew—a child, who if there ever was one, needed such a trained individual. Not even CMCSS's school psychologist disagreed with a substantial number of intervention weeks being necessary.[26]

55. Instead, the ALJ merely found that, in tenth grade, "CMCSS personnel employed Orton-Gillingham methods *to help M.B. learn to read.*"[27] CMCSS was actually *rewarded* for failing to teach a child with dyslexia to read throughout elementary, middle, and high school. Moreover, "learning to read" in tenth grade is not FAPE for a student who, by that point, *should already be a functional reader*. He would require far more intensive support built into the IEP, including, at a minimum, dyslexia-specific interventions employed by a person highly trained in dyslexia, as well as extensive compensatory education.

56. Based upon the foregoing Facts and due to the foregoing Legal Errors, Plaintiffs now request the following relief under the IDEA:

    a. Reversal of the ALJ's Findings that FAPE and Child Find were consistently met under all of the applicable years—to first grade under discovery rule and/or 2019—under the IDEA;

---

[26] See Footnote 24.

[27] Moreover, not even the factual finding underpinning the belief that Orton-Gillingham was employed by a trained professional was correct. Ms. Purdy was *not* trained in Orton-Gillingham and had no experience teaching dyslexia at all.[27] In fact, she did not even teach reading. While M.B. and his parent/guardians liked her and wanted her involved, she was a math teacher. CMCSS refused to allow the one teacher trained in dyslexia-specific interventions and Orton Gillingham methodology, Ms. McAffee, to work with M.B.

14

b. A finding of denial of Free Appropriate Education (FAPE) with a remedy of modifying the IEP to provide dyslexia-specific instruction by a trained professional for mixed-type dyslexia in high school through Orton Gillingham or substantially equivalent program, with up to four (4) years of additional instruction (e.g. compensatory education). Given the degree of harm, Plaintiffs request, as a remedy, that this be through a Certified Academic Language Therapy Associate (or similarly trained person to assist Matthew's mixed type dyslexia), and be administered through an appropriate fund through the parent/representative;

c. Extended eligibility under IDEA in order to meet Matthew's needs owing to the great number of years of deprivation;

d. Mandatory district-wide training on child find and the provision of dyslexia specific interventions;

e. Reasonable Attorneys' Fees and Expenses;

f. Any Other Relief at law or equity to which they may be entitled.

Respectfully Submitted,

**GILBERT LAW, PLC**

/s Justin S. Gilbert

Justin S. Gilbert (TN Bar No. 017079)
100 W. Martin Luther King Blvd, Suite 501
Chattanooga, TN 37402
Telephone: 423.756.8203
Facsimile: 423.756.2233
justin@schoolandworklaw.com

&

**THE SALONUS FIRM, PLC**

/s Jessica F. Salonus
JESSICA F. SALONUS (28158)
139 Stonebridge Boulevard
Jackson, Tennessee 38305
Telephone: (731) 300-0970
jsalonus@salonusfirm.com

***ATTORNEYS FOR PLAINTIFFS***

## CERTIFICATE OF SERVICE

I, the undersigned, do hereby certify that a true and exact copy of the foregoing Complaint has been filed electronically and copied via email to the following on September 1, 2022.

John D. Kitch
Rebecca W. Demaree
Cornelius & Collins LLP
511 Union Street, Suite 1500
P.O. Box 190695
Nashville, Tennessee 37219
Telephone: (615)- 244-1440
Facsimile: (615)-254-9477
jdkitch@cclawtn.com
rwdemaree@cclawtn.com

*Justin S. Gilbert*