# IN THE UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

| | | |
|---|---|---|
| **MATTHEW B., by and through his** | ) | |
| **Representative and Parent, G.F. and B.B.,** | ) | |
| | ) | |
| **v.** | ) | **No. 3:22-cv-00675** |
| | ) | |
| **CLARKSVILLE MONTOMERY** | ) | |
| **COUNTY SCHOOL SYSTEM** | ) | |

**To: The Honorable William L. Campbell, Jr., District Judge**

## REPORT AND RECOMMENDATION

Matthew B. brought this action, by and through his representative, G.F., and parent, B.B. ("Plaintiffs"), under the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. §§ 1400 *et seq.*, appealing an adverse final order from a state administrative law judge ("ALJ"). This appeal concerns Matthew's rights under the IDEA and whether the Clarksville Montgomery County School System ("Defendant" or "CMCSS") provided Matthew with a free and appropriate public education as required by the IDEA for the 2011-12 to 2020-21 school years, or when Matthew was in the first through tenth grade.

Before the Court are competing motions for judgment on the administrative record: (1) Plaintiffs' motion (Docket No. 13) to which Defendant responded (Docket No. 15) and to which Plaintiff filed a reply (Docket No. 17); and (2) Defendant's motion (Docket No. 11) to which Plaintiff responded (Docket No. 16). This matter has been referred to the undersigned pursuant to 28 U.S.C. § 636(b)(1) for initial consideration and a Report and Recommendation. (Docket No. 19.)

Upon consideration of the administrative record as a whole and the parties' filings, the undersigned Magistrate Judge respectfully recommends that Plaintiffs' motion (Docket No. 13) be GRANTED IN PART AND DENIED IN PART; Defendant's motion (Docket No. 11) be GRANTED IN PART AND DENIED IN PART; this matter be REMANDED to the ALJ for further findings and conclusions consistent with this Report and Recommendation; and this matter be administratively closed pending the outcome of the administrative proceedings on remand.

## I.     BACKGROUND

### A.    IDEA

The IDEA offers federal funding to participating states, including Tennessee, for the purpose of providing a "free and appropriate public education" ("FAPE") to school-aged children with disabilities. 20 U.S.C. §§ 1411, 1412. In general, the IDEA aims to ensure that every child has a meaningful opportunity to benefit from public education. *S.B. v. Murfreesboro City Sch.*, No. 3-15-0106, 2016 WL 927441, at \*5 (M.D. Tenn. Mar. 11, 2016). The IDEA mandates that children with disabilities, to "the maximum extent appropriate," should be:

> educated with children who are not disabled, and special classes, separate schooling, or other removal of children with disabilities from the regular educational environment occurs only when the nature or severity of the disability of a child is such that education in regular classes with the use of supplementary aids and services cannot be achieved satisfactorily.

20 U.S.C. § 1412(a)(5)(A).

The "linchpin" of the IDEA is a process referred to as the "individualized educational program" ("IEP"), which involves a meeting of the eligible student's parents, teachers, and representatives of the local educational agency where the parties discuss the child's progress and educational goals. *Id*. § 1414; *Gibson v. Forest Hills Local Sch. Dist. Bd. of Educ.*, 655 F. App'x 423, 426 (6th Cir. 2016) (citing *Honig v. Doe*, 484 U.S. 305, 311–12 (1988)). Based on discussions

2

from this meeting, an IEP document is drafted, which "evaluates the child's academic achievement and functional performance, as well as her short-term and long-term goals." *Gibson*, 655 F. App'x at 426.

Under the IDEA, parents who consider their child's placement and/or IEP inappropriate and who believe that their child has been denied a FAPE have a right to an impartial due process hearing by a state or local educational agency. 20 U.S.C. § 1415(f) and (g). In Tennessee, the "due process hearing" is conducted before an ALJ employed by the Secretary of State, Administrative Procedures Division, who is trained in special education law. *Gibson*, 655 F. App'x at 426-27; 20 U.S.C. § 1415; Tenn. Code Ann. § 49-10-606. Following exhaustion of this administrative remedy, the ALJ's decision may be appealed in federal court. 20 U.S.C. § 1415(i)(2). The IDEA empowers courts to "grant such relief as the court determines is appropriate." 20 U.S.C. § 1415(i)(2)(C)(iii).

**B.    Underlying Facts[1]**

Matthew is a rising high school senior who has been diagnosed with dyslexia and ADHD. Matthew was enrolled in CMCSS for over eleven years – from the fall of 2009 through the spring of 2021. He first enrolled in CMCSS at St. Bethlehem Elementary School for kindergarten during the 2009-10 school year.[2] He repeated kindergarten during the 2010-11 school year and continued at St. Bethlehem Elementary for first, second, and third grades during the 2011 through 2014 school years. He then moved to Burt Elementary School for fourth and fifth grades during the 2014

---

[1] Unless otherwise indicated, the facts included in this section are taken from the parties' respective briefs and the sealed administrative record and are undisputed.

[2] While in kindergarten, Matthew B. was placed on a "student intervention plan" beginning on September 1, 2009. (Docket No. 10-12.) In this plan, it was noted that he did not have an IEP or education plan, but that he required intervention in the areas of reading, writing, spelling, and math. (*Id.*) His letter recognition, letter sounds, and reading readiness word recognition scores were low. (*Id.*)

to 2016 school years. Matthew next went to Kenwood Middle School for sixth, seventh, and eighth

grades during the 2016 to 2019 school years. Finally, he attended Northeast High School for ninth

and tenth grades during the 2019 to 2021 school years. During his time at CMCSS, Matthew had

19 IEPs, many of which spanned two grade levels:

| School | Grade(s) | Dates IEP In Effect | Location (Docket No.) |
|---|---|---|---|
| St. Bethlehem Elementary | 1, 2 | 02/27/12 – 02/26/13 | 10-71 |
| | 2, 3 | 02/11/13 – 02/10/14 | 10-72 |
| | 3 | 01/24/14 – 05/30/14 | 10-73 |
| Burt Elementary | 3, 4 | 05/09/14 – 05/08/15 | 10-74 |
| | 4 *Addendum* | 12/16/14 – 05/08/15 | 10-75 |
| | 4 *Addendum* | 02/10/15 – 05/08/15 | 10-76 |
| | 4, 5 | 04/30/15 – 04/29/16 | 10-77 |
| | 5 *Addendum* | 09/25/15 – 04/29/16 | 10-78 |
| | 5 *Addendum* | 10/27/15 – 04/29/16 | 10-79 |
| Kenwood Middle | 5, 6 | 04/29/16 – 04/28/17 | 10-80 |
| | 6, 7 | 04/21/17 – 04/21/18 | 10-82 |
| | 7 *Addendum* | 09/08/17 – 04/21/18 | 10-83 |
| | 7, 8 | 02/09/18 – 02/09/19 | 10-84 |
| | 7, 8 *Addendum* | 05/01/18 – 02/09/19 | 10-85 |
| | 8 *Addendum* | 09/05/18 – 02/09/19 | 10-86 |
| Northeast High | 9, 10 | 01/16/20 – 01/15/21 | 10-87 |
| | 9, 10 *Addendum* | 04/14/20 – 01/15/21 | 10-88 |
| | 10 *Addendum* | 10/20/20 – 01/15/21 | 10-89 |
| | 10, 11 | 02/03/21 – 02/02/22 | 10-90 |

Every IEP included goals related to Matthew's reading and math skills, and some included

goals related to "academics" and/or pre-vocational skills. Most of the IEPs in the record are signed

by Matthew's parent and/or guardian, and although some are not signed, the parties do not dispute

that Matthew's parent and/or guardian consented to the IEPs.

4

1.      St. Bethlehem Elementary School: Grades 1 to 3

Matthew was first referred for a psychoeducational evaluation during his first-grade year at St. Bethlehem Elementary "by his parent due to concerns an educational disability may be present." (Jan. 23, 2012 Psycho-Educational Report, Docket No. 10-18 at 1.) Dr. Patti L. Wilson, a CMCSS school psychologist, tested Matthew and determined that his intellectual functioning was in the "average range of intelligence" and that he experienced "attention and working memory difficulties." (Id. at 8.) Dr. Wilson stated that Matthew had a medical diagnosis of attention deficit hyperactivity disorder ("ADHD")[3] and stated that he met the "standards for identification as having a Learning Disability." (Id. at 1, 8.) She suggested that "other health impaired" ("OHI") would be the most appropriate category of disability for him. (Id. at 8.) She recommended specific strategies related to Matthew's instruction, environment, and reading, and generally recommended that Matthew's IEP team put together a plan for him. (Id. at 8–9.)

On February 27, 2012, Matthew's IEP team met for the first time and created his IEP for the next calendar year, or the remainder of his first-grade year and a portion of his second-grade year. (First & Second Grade IEP, Docket No. 10-71.) The IEP team included Matthew's mother, a local educational agency ("LEA") representative, two special education teachers, a regular education teacher, and Dr. Wilson, who served as the interpreter of evaluation results.[4] The IEP listed Matthew's primary disability as "Other – Health Impairments" and his secondary disability

---

[3] The record indicates that Matthew's diagnosis was called both attention deficit disorder ("ADD") and attention deficit hyperactivity disorder ("ADHD") at different times. For consistency, the Court will refer to the diagnosis as "ADHD" throughout this Report and Recommendation, even if the document to which the Court cites uses the term "ADD."

[4] The record reflects that either one or both of Matthew's parents and/or guardian attended every IEP meeting. Accordingly, all references in this Report and Recommendation to the "IEP team" include both the CMCSS staff in attendance and Matthew's parents and/or guardian.

5

as "none." (*Id.* at 1.) The IEP noted in the Present Level of Performance ("PLOP") section that Matthew's performance on the reading composite of the Wechsler Individual Achievement Test, Third Edition, was in the "Extremely Low" range, which suggested that Matthew had "significantly less well developed skills" and experienced "much difficulty" in reading.[5] (*Id.* at 2.)

The First and Second Grade IEP noted that Matthew's parents were concerned with his progress and wanted to ensure that the IEP team was aware of his difficulties and shared information about ways to increase his reading level. (*Id.* at 2.) It included two reading goals: (1) develop and use decoding strategies to read unfamiliar words as measured by teaching data and fluency checks, and (2) read to develop fluency, expression, accuracy, and confidence, and increase fluency rate to 60 correct words per minute. (*Id.* at 5.) The second reading goal was modified to include a reading intervention program. (*Id.*) The IEP also provided for classroom and standardized testing accommodations, including extra cues and prompts on assignments, directions in small and distinct steps, peer tutoring, and oral testing, among others. (*Id.* at 9.) Under the IEP, Matthew was to receive 45 minutes per day of reading intervention and instruction in a special education or "pullout" setting away from non-IEP students. (*Id.* at 13.) Otherwise, he was to learn and participate in school in the general education setting among his peers. (*Id.*)

The IEP team next met on February 11, 2013 to discuss an IEP for the remainder of Matthew's second-grade year and a portion of his third-grade year. (Second & Third Grade IEP, Docket No. 10-72.) This IEP stated that Matthew's disability affected his involvement and progress in the general school curriculum because he had "difficulties sustaining attention,

---

[5] Matthew's First and Second Grade IEP also included goals related to writing and mathematical processes, as did many of his IEPs from the first through tenth grades. (Docket No. 10-71 at 6–7.) However, because the parties focus on Matthew's reading skills, the Court will only address Matthew's writing, mathematics, and pre-vocational goals when relevant.

6

processing information correctly and efficiently, and [with] long-term retrieval." (*Id.* at 2.) In the PLOP section, the IEP referenced a Dynamic Indicators of Basic Early Literary Skills ("DIBELS")[6] test from October 29, 2012 that indicated that Matthew was reading only 4 words per minute on a second-grade level, and that he was not able to retell what he read. (*Id.*) The PLOP section also referenced a fluency assessment and a read well assessment from February 7, 2013 that showed Matthew was reading below grade level in fluency and had difficulty with blending words, fluency, and accuracy. (*Id.* at 2–3.) The IEP included goals related to "academics," which focused on reading fluency. For example, Matthew was to read with increasing fluency and confidence through paired readings, shared reading, and more; use decoding strategies like sounding out words and breaking words into smaller parts; and maintain phonemic awareness. (*Id.* at 5.) The IEP also set a goal for Matthew to read to develop fluency, expression, accuracy, and confidence by reading orally and reflecting punctuation within written text while reading orally. (*Id.* at 6.)

Once again, the Second and Third Grade IEP provided for classroom and standardized testing accommodations, including extra cues and prompts on assignments, abbreviated assignments, directions in small and distinct steps, modification of the format of homework and tests, peer tutoring, oral testing, and additional time for assignments, among other. (*Id.* at 9.) He received a custom accommodation whereby he would receive only twenty minutes of homework per night. (*Id.*) Under this IEP, Matthew continued to receive 45 minutes per day of reading intervention and instruction in a special education or "pullout" setting away from non-IEP

---

[6] Sarah McAfee, former dyslexia specialist for CMCSS, described DIBELS as a "one-minute reading assessment that assesses fluency only" and stated that is not widely used because it is not a good measure of skills like decoding, phonics, or phonemic awareness. (S. McAfeee Test., Hr'g Tr. I, Docket No. 10-3 at 41 (158:21–159:9).)

students. (*Id.* at 16.) Just as before, he was to otherwise learn and participate in school in the general education setting among his peers. (*Id.* at 17.)

The next IEP meeting took place on January 24, 2014 where the team discussed Matthew's plan for the remainder of his third-grade year. (Third Grade IEP, Docket No. 10-73.) This IEP contained an identical description of how Matthew's disability affected his involvement and progress in the general school curriculum. (*Id.* at 2.) The PLOP section referenced a new read well assessment from January 17, 2014 that indicated that Matthew continued to have a difficult time blending words and with fluency and accuracy in reading. (*Id.*) A fluency test from the same day indicated that Matthew could read around 20 words on a 1.6 grade level and remained below grade level in fluency. (*Id.* at 3.) The PLOP section stated that Matthew could decode a word correctly but would say a different word. (*Id.*) The Third Grade IEP contained the exact same academic and reading goals and the exact same classroom accommodations for reading as did the Second and Third Grade IEP. (*Id.* at 5–6.) Just as with his prior IEPs, Matthew received 45 minutes per day of reading intervention in a special education or "pullout" setting. (*Id.* at 15.)

2.    Burt Elementary School: Grades 4 to 5

A few months later, on May 9, 2014, the IEP team met again to determine Matthew's plan for the very end of his third-grade year at St. Bethlehem Elementary and the entirety of his fourth-grade year at Burt Elementary. (Third & Fourth Grade IEP, Docket No. 10-74.) The IEP described Matthew as having an advanced oral vocabulary, but only being able to read at around 10 correct words per minute. (*Id.* at 2.) A Gray Oral Reading Test assessment taken on April 1, 2014 showed that his fluency and comprehension was "less than 1% with an oral reading quotient of 52" which was in the "very poor" range. (*Id.*) Matthew was unable to comprehend grade level text without read aloud because of his lack of reading rate and accuracy. (*Id.*) A DIBELS monitoring

8

assessment taken on April 9, 2014 showed that Matthew struggled with oral reading fluency and

retell. (*Id.* at 3.) This IEP contained new specific reading goals:

> While reading a passage, Matthew will use decoding and word recognition skills with 80% accuracy four of five trials as measured by teacher observation.

> When presented with lists of words with vowel digraphs, vowel diphthongs, and initial sound blends, Matthew will correctly read the words with 60% accuracy in four of five trials, as measured by teacher observation and data collection.

> Given 50 grade level sight words, Matthew will correctly identify the sight words with a decrease in wait time (i.e. 20 seconds per word to 10 seconds per word or 5 min total to 2 min total) in five consecutive trials as measured by teacher observation and data collection.

> When presented with who, where, how, why, and what-if questions after reading a story silently, Matthew will answer comprehension questions with 80% accuracy four of five trials as measured by assessments and teacher observation.

> Given a passage at instructional level, Matthew will increase his fluency rate by reading at least 40 wcpm with 2 or fewer errors in weekly data collections as measured by data collection.

(*Id.* at 6-7.) Matthew's classroom accommodations for reading were revised and no longer

included additional time on assignments, among other changes. (*Id.* at 9.) Matthew received more

direct special education services than he had in the prior years, but he received only 30, instead of

45, minutes per day of reading intervention in a special education or "pullout" setting. (*Id.* at 15.)

On December 16, 2014, in the middle of his fourth-grade year, the IEP team met again and

revised some of Matthew's goals for the rest of the fourth-grade year. (Fourth Grade IEP

Addendum, Docket No. 10-75.) There is no indication in the record to explain why the team sought

to amend the IEP at that point, but the IEP was changed to specify that data related to two of

Matthew's reading goals would be communicated with his family on a regular basis and to increase

his "pullout" time for reading intervention from 30 to 40 minutes per day. (*Id.* at 5, 12.) His

classroom accommodations for reading were also revised, though it is not clear if these new accommodations were to replace or supplement the prior accommodations. (*Id.* at 7.)

A few months later, on February 10, 2015, the IEP team met again. (Fourth Grade IEP Addendum, Docket No. 10-76.)[7] The IEP was revised to add accommodations for the writing portion of the Tennessee Comprehensive Assessment Program ("TCAP"), but all other portions of the IEP remained the same.[8] (*Id.* at 11.) The new IEP was otherwise the same as the prior IEP.

On February 13, 2015, several days after the February 2015 IEP meeting, the IEP Team undertook Matthew's triannual reevaluation to determine his eligibility under the IDEA. (Eligibility Report, Docket No. 10-19.)[9] This evaluation is required to determine if a student continues to have a disability and to determine the student's needs. *See* 20 U.S.C. § 1414(a)(2). The IEP team determined that Matthew met the criteria for a disability and that his disability adversely impacted his education performance. (*Id.* at 1.) The Eligibility Report listed Matthew's primary disability as "Other – Health Impairments" but did not include a secondary disability. (*Id.* at 2.) His ADHD was listed as an educationally relevant medical finding.[10] (*Id.*) His behavior history was listed as "adequate." (*Id.* at 4.) The Eligibility Report included some of Matthew's prior achievement assessment scores; stated that current and previous achievement assessments were

---

[7] The Fourth Grade IEP Addendum can also be found at Docket No. 10-81, though this copy is difficult to read.

[8] The prior IEP included accommodations for the English/reading/language arts, mathematics, science, and social studies portions of the TCAP, but not the writing portion. (Docket No. 10-75 at 10–11.)

[9] The copy of the February 13, 2015 IEP eligibility determination and evaluation that is included in the record appears to have been scanned and is, therefore, quite difficult to read. (Docket No. 10-19.)

[10] The Eligibility Report states that Matthew did not take medications for his ADHD and had not taken any for the last two years. (*Id.* at 2.)

consistent; and stated that no additional assessments were relevant. (*Id.* at 5–7.) It also included

his prior Wechsler Intelligence Scale for Children, Fourth Edition, scores – a full scale score of 90

from an April 15, 2011 assessment and a full-scale score of 103 from a January 23, 2012

assessment – and stated that no additional cognitive assessments were relevant. (*Id.* at 9–10.)

Additional information and documents were attached to the Eligibility Report. Matthew's

2014 TCAP scores showed that he received a score of 705 on reading and language, which placed

him in the 11th percentile or "below basic" performance level.[11] (*Id.* at 19.) Two of Matthew's

classroom teachers completed observation questionnaires. (*Id.* at 27, 29.) Both listed his current

progress as "not satisfactory" and were concerned by his "learned helplessness" or "frustration."

(*Id.*) His ELA and social studies teacher was also concerned with his inability to read on a fourth-

grade level. (*Id.* at 29.) His special education teacher also observed him and stated that he was

"articulate" but that he had a difficult time decoding written material and was "frustrated" with his

own progress. (*Id.* at 28.) Based on his classroom performance, information from his parents, and

observations from his teachers, the test interpreter found that Matthew's achievement abilities,

adaptive skills, and cognitive abilities were consistent with his previous cognitive assessment. (*Id.*

at 5–10.)

The IEP team determined that additional data was not needed to determine Matthew's

continued needs for special education or related services; his present levels of academic

achievement; whether he continued to have an educational disability; or whether any additions or

modifications to his services were needed. (*Id.* at 14.) Accordingly, Matthew did not receive any

new assessments related to his academic achievement, intellectual functioning, or speech/language

---

[11] Matthew was also in the "below basic" performance level for science and math. (*Id.* at 18, 20.)

skills, among other areas. (*Id.*) Instead, the IEP team decided that Matthew continued to be eligible for special education services with a primary disability of "Other – Health Impairments" and without a secondary disability. (*Id.* at 15.) Matthew's parent agreed that he continued to be eligible with his currently identified disabilities. (*Id.* at 17.)

The team met again on April 30, 2015 at the end of Matthew's fourth-grade year to create his IEP for the remainder of the year and the entirety of the fifth-grade year. (Fourth & Fifth Grade IEP, Docket No. 10-77.) The IEP reflected new concerns from his parents about his progress and included a statement from his mother that she would like him to "find a way to be successful at reading and writing activities." (*Id.* at 2.) The PLOP section indicated that Matthew completed a universal screener for oral reading fluency on March 23, 2015 and could read 9 out of 16 words correctly. (*Id.* at 3.) He struggled to decode and remember letter patterns and sounds. (*Id.*) For the first time, the IEP implemented assistive technology, including text-to-voice assistance, which Matthew could use for extensive reading assignments and to dictate written assignments. (*Id.* at 4.) His reading goals were the same as his prior IEP for the fourth-grade year, but his classroom accommodations for reading were pared down to only include receiving directions on assignments in small, distinct steps; being able to take tests orally; and having regular check ins on whether he was understanding and reviewing the subject matter. (*Id.* at 7.) He continued to receive 40 minutes per day of "pullout" reading intervention. (*Id.* at 11.)

The IEP team next met on September 25, 2015 towards the beginning of Matthew's fifth-grade year. (Fifth Grade IEP Addendum, Docket No. 10-78.) This IEP revised one reading goal to be measured by data rather than teacher observations; added a custom accommodation related to his reading to allow him to provide oral responses for assignments and tests; revised his TCAP

accommodations; and increased his "pullout" reading intervention from 40 to 45 minutes per day. (*Id.* at 7, 9–10.)

The IEP team met again one month later, on October 27, 2015, to amend the IEP once more to include different classroom accommodations related to spelling and to add additional accommodations related to TCAP testing. (Fifth Grade IEP Addendum, Docket No. 10-79 at 7, 10.)

### 3. Kenwood Middle School: Grades 6 to 8

Towards the end of his fifth-grade year, on April 29, 2016, the IEP team met to determine Matthew's plan for the rest of his fifth-grade year at Bart Elementary and the entirety of his sixth-grade year at Kenwood Middle. (Fifth & Sixth Grade IEP, Docket No. 10-80.) The IEP noted that Matthew had been diagnosed with ADHD but was not on any medication. (*Id.* at 1.) It also indicated that Matthew's father was concerned about him reaching his full potential and did not want his teachers to give up on him. (*Id.* at 2.) According to the IEP, Matthew's disability adversely impacted his access to the general curriculum as follows:

> Matthew's deficits in reading decoding prevent him from reading grade level material. This negatively impacts his ability to practice or master grade level standards across all subjects. Matthew's deficits in math calculations negatively impact his ability to complete grade level math problems involving math calculation. Matthew's deficits in pre-vocational skills often remove him from the classroom. He refuses to do work, becomes agitated and leaves, and will often speak in an inappropriate tone with adults.

(*Id.*) Matthew took a universal screener assessment on April 29, 2016 and was able to read an average of 10 out of 19 words attempted, which placed him in the first percentile nationally which was "far below expectation" for his age and grade level. (*Id.* at 3.) His goals and classroom accommodations remained unchanged from his previous IEP, though the IEP added new TCAP accommodations related to the science and mathematics sections of the test. (*Id.* at 5–11.)

13

The IEP team met one year later, on April 21, 2017, to put a plan in place for the remainder of the sixth-grade year and the upcoming seventh-grade year. (Sixth & Seventh Grade IEP, Docket No. 10-82.) Once again, Matthew's difficulties with reading were apparent. (*Id.* at 1.) During his sixth-grade year, Matthew underwent several functional and academic assessments (Functional Behavior Assessment & Behavior Intervention Plan, Docket No. 10-22;[12] Woodcock Johnson IV Score Report, Docket No. 10-23) and his teachers provided their own functional and academic assessments (Functional Behavior Assessment Teacher Interview Form, Docket No. 10-20; Reinforcement Inventory, Docket No. 10-21; Pre-Vocational Checklist, Docket No. 10-24). The PLOP section of his IEP detailed the results of these assessments and showed continued reading deficits. For example, the Woodcock-Johnson assessment indicated that Matthew had a "severe deficit with basic reading (including decoding, fluency, etc.)" and was at a kindergarten or first grade equivalency. (Docket No. 10-82 at 2.) The PLOP section also indicated mixed results on whether Matthew was meeting the target growth factor for reading. (*Id.* at 2–3.) For the first time since his Fourth and Fifth Grade IEP, Matthew did not need assistive technology to implement his IEP. (*Id.* at 5.) The IEP contained three new goals related to reading[13] and revised his classroom and testing accommodations to allow him to use a reader or scribe. (*Id.* at 6, 8–10.) It also stated

---

[12] The record contains another Functional Behavior Assessment and Behavior Intervention Plan that appears to be a modification of the one located at Docket No. 10-22 and dated January 17, 2017. (Docket No. 10-26.) This later assessment is dated January 17, 2017, April 21, 2017, September 8, 2017, and October 27, 2018. (*Id.* at 1.)

[13] Those included identifying 35 words per minute with only 3 word errors as measured every three weeks; correctly identifying 80% of the pre-primer to first grade level Dolch sight words as documented by probes given every week; and answering comprehension reading questions, both implicit and explicit, with 50% accuracy on 3 consecutive reading probes as measured every 3 weeks. (Docket No. 10-82 at 6.)

14

that his father planned to start providing him with medication for his ADHD over the summer to "test the effects." (*Id.* at 1.)

The IEP team next met on September 8, 2017 at the beginning of Matthew's seventh-grade year. (Seventh Grade IEP Addendum, Docket No. 10-83.) Matthew was given additional classroom accommodations, including a modified grading scale, the ability to present assignments orally when possible, and the use of a scribe for long or extended writing assignments. (*Id.* at 8.) He also was allowed additional accommodations for TCAP testing. (*Id.* at 10.)

The next IEP meeting was held on February 9, 2018 where the team put together Matthew's plan for the rest of his seventh-grade year and most of his eighth-grade year. (Seventh & Eighth Grade IEP, Docket No. 10-84.) On that same date, Matthew underwent his triannual reevaluation to determine his eligibility under the IDEA. (Eligibility Report, Docket No. 10-28.) The IEP team determined once again that Matthew met the criteria for a disability and that his disability adversely impacted his education performance. (*Id.* at 1.) His primary disability remained "Other – Health Impairments" and he still did not have a secondary disability. (*Id.*) His ADHD was listed as an educationally relevant medical finding.[14] (*Id.* at 2.) The Eligibility Report noted that his parents had separated and that he was living with his father. (*Id.*) The Eligibility Report included an observation questionnaire from Matthew's social studies teacher who stated that he could not read but noted that she did not have any concerns. (*Id.* at 13.) In addition, the Eligibility Report included a Functional Behavior Assessment Student Assisted Interview Form where Matthew stated that schoolwork was "in between" easy and hard for him, his behavior had improved from the prior

---

[14] The Eligibility Report stated that Matthew was taking 30 milligrams of Adderall for his ADHD. (*Id.* at 2.)

year, and he experienced problems when others were loud but took breaks to calm himself. (*Id.* at 14.) Matthew was described as "very willing, cooperative, and open to the interview." (*Id.*)

Once again, the IEP Team determined that additional data was not needed to determine if Matthew continued to have an education disability; his continued needs for special education or related services; his present levels of academic achievement; whether he continued to have an educational disability; or whether any additions or modifications to his services were needed. (*Id.* at 6.) Accordingly, Matthew did not receive any new assessments related to his academic achievement, intellectual functioning, or speech/language skills, among other areas. (*Id.*) Instead, the IEP team decided that Matthew continued to be eligible for special education services with a primary disability of "Other – Health Impairments" and without a secondary disability. (*Id.* at 9.) Matthew's parent agreed that he continued to be eligible with his currently identified disabilities. (*Id.*)

The Seventh and Eighth Grade IEP stated that Matthew "made vast improvements in all areas in the last year, including his reading fluency." (Docket No. 10-84 at 2.) It also stated that he had started to take medication for his ADHD. (*Id.* at 1.) As reflected in the PLOP section of his IEP, Matthew took another universal assessment in reading, which reflected improvements in his reading, though his scores remained low:

> In 7th grade, Matthew completed the Path Driver Universal Screener in Reading. He demonstrated an increase from his Fall score, where he placed in the 5th percentile nationally, to his Winter score, where he placed in the 10th percentile. However, based on Matthew's own admission to simply guessing, as well as his perceived struggle with basic reading fluency, this information may prove invalid.

> Based on one source of progress monitoring, completed using Path Driver, Matthew's instructional level is 3. He is meeting the target growth factor, set at 1.5, and is progressing at Rate of Improvement of 0.33 vs the Typical Rate of Improvement of 0.06.

16

> Matthew also participates in i-Ready, a program designed to pinpoint Matthew's deficits in sub-skills and demonstrate growth in those sub-skills. Matthew, in just three months has demonstrated a 57 point gain in his target sub-skills. Growth for an entire year is expected to be 13 points. He is far exceeding the end of year growth. Specifically, in independent reading comprehension, Matthew scored an 88% at a Level 1 informational text[.] For a narrative text, Matthew scored 100% at a Level one. Matthew remains at a level 1 for both informational and narrative. This, as well, demonstrates growth in that he started off at the Level K.

(*Id.* at 2–3.) Matthew's classroom accommodations were scaled back and his TCAP testing accommodations were changed – he no longer received rest and break periods but did receive some "human reader/human signer" accommodations. (*Id.* at 11–12.) The IEP also decreased his "pullout" reading time for his upcoming eighth-grade year from 45 minutes per day for all 5 days of the week to 30 minutes per day for only 3 days of the week. (*Id.* at 13.)

On May 1, 2018, the IEP team met to create an addendum to the Seventh and Eighth Grade IEP. (Seventh and Eighth Grade IEP Addendum, Docket No. 10-85.) The addendum increased Matthew's "pullout" reading intervention time from 3 to 5 days of the week and added an additional 45 minutes per day of inclusion reading time. (*Id.* at 14.)

The IEP team next met on September 5, 2018 at the beginning of the eighth-grade year to further revise the IEP. (Eighth Grade IEP Addendum, Docket No. 10-86.) Matthew attended the IEP meeting and was interviewed. (*Id.* at 6.) The IEP revised his pre-vocational goal and removed his reading comprehension goal. (*Id.* at 8-9.) Later, during his eighth grade, Matthew was placed on a behavior intervention plan. (Docket No. 10-29.)

A meeting notice letter indicates that an IEP meeting took place during the second semester of Matthew's eighth-grade year on April 8, 2019 to "discuss a change in education" – which presumably referred to Matthew's transition from middle to high school – but there are no other documents in the record related to this meeting. (IEP Meeting Letter, Docket No. 10-34.)

4. <u>Northeast High School: Grades 9 to 10</u>

The next IEP meeting took place over one year later, on January 16, 2020, during Matthew's second semester of his ninth-grade year at Northeast High School. (Ninth & Tenth Grade IEP, Docket No. 10-87.) During the first semester of his ninth-grade year, G.F., who would later become Matthew's representative, became involved in Matthew's education. She came into Matthew's life in the fall of 2018 when she began to date his father, B.B., but did not became directly involved in his education until the fall of 2019. (G.F. Test., Hr'g Tr. I, Docket No. 10-3 at 55 (216:15–20), 56 (218:22–220:10).) The January 2020 IEP meeting was the first one that G.F. attended and she continued to be involved in Matthew's education from then on. (Text Messages, Docket No. 10-37; Email, Docket No. 10-38.)

The January 2020 IEP states that Matthew was removed from medication for ADHD due to "negative side effects" and was attending counseling. (Docket No. 10-87 at 1.) The PLOP section indicated that he took an easyCBM assessment on January 14, 2020, which indicated that he was still struggling with reading comprehension, which negatively impacted his performance in all content areas. (*Id.* at 3.) The assessment also showed that he was reading at a first-grade level despite being in the ninth grade. (*Id.* at 4.) The IEP included information on Matthew's post high school transition plans, which included attending a technical school after graduation. (*Id.*) It also included new reading fluency and comprehension goals, as well as modified classroom accommodations, which included not asking Matthew to read out loud in class[15] and Matthew

---

[15] It is not clear why the accommodation to not read aloud was added, but it may be in response to a behavioral issue that Matthew had in February 2019. (Email Correspondence, Docket No. 10-33.) After Matthew refused to read aloud on a graded assignment, his teacher contacted his father, B.B., to inform him of the incident. (*Id.* at 1–2.) B.B. stated that reading aloud was difficult for Matthew and made him "stand offish." (*Id.* at 1.) B.B. asked Matthew's teacher to not make him read aloud and believed that the IEP in place at the time reflected the same. (*Id.*)

18

being able to use a "chill pass" to leave class for up to 10 minutes if he was upset. (*Id.* at 6, 8.) The IEP also included new direct special education services for Matthew's high school courses, which included physical science, world history, biology, and government, among others. (*Id.* at 13.) He also received "pullout" services for 45 minutes per day for 5 days per week for algebra and literacy transitions, which meant that these two classes were taught in the "resource setting." (*Id.* at 13, 15.)

After the January 2020 IEP meeting, Matthew underwent a comprehensive evaluation with CMCSS psychologist Megan Christensen, the results of which Ms. Christensen summarized on February 26, 2020. (Diagnostic Summary, Docket No. 10-40.) Matthew's representative and parent, G.F. and B.B., referred him for the evaluation "due to concerns regarding his reading skills and lack of academic progress. They also wanted to explore evaluations specific to dyslexia." (*Id.* at 1.) Ms. Christensen administered four tests: (1) a Naglieri Nonverbal Ability Test, which indicated that Matthew's cognitive abilities fell within the average range; (2) a Woodcock Johnson Test of Achievement, Fourth Edition, which indicated that Matthew was in the less than 1st percentile rank for basic reading skills, phoneme-grapheme knowledge, reading fluency, reading comprehension, and broad reading; (3) a Feifer Assessment of Reading, which suggested that Matthew had "significant difficulty with most aspects of the reading process" and a mixed dyslexia presentation; and (4) a Conners Third Edition, which indicated that he had behavioral issues in unstructured classes (i.e., P.E.) and that his teachers were concerned with his inattention and difficulty focusing on tasks for extended periods of time. (*Id.* at 1–6.)

Ms. Christensen summarized the results of the assessments as follows:

Matthew is a very personable and hard working 9th grade student who attends Northeast High School. He is currently receiving special education services as a student with Other Health Impairments, based on a diagnosis of ADHD. He was

referred for an evaluation by his parents to address his reading difficulties and concerns about him possibly having dyslexia.

Based on the current evaluations, Matthew presents with average cognitive abilities, with historical difficulties noted with working memory skills. Academically, he demonstrates a relative strength related to his applied math skills, which fell within the average range. His overall reading skills are significantly below grade level in all areas. He struggles with basic reading skills, such as decoding, word recognition and basic phonics skills, which has led to delays in both fluency and comprehension. He was administered the FAR, to look more directly at characteristics of dyslexia. Based on his performance, Matthew presents with deficits in phonological, orthographic, and fluency skills, which suggests a mixed dyslexia presentation.

Because we do not have grade level norms for basic reading skills in our progress monitoring program, we use reading fluency scores to calculate his rate of improvement and gap between his performance and his grade level peers. At this point in the school year, the grade level expectation for reading fluency is to read at least 144 correct words per minute. He is currently reading 71 correct words per minute on grade level, which results in a gap of 2.03 between his performance and that of his peers. His current rate of improvement, given interventions in basic reading and fluency in Literacy Transitions, is .83, is excellent and well above expectation, however, it would still take him almost 70 weeks to catch up to his peers at this rate, with his interventions, which is not a reasonable expectation. Current progress monitoring data, paired with achievement data, suggests that Matthew meets criteria for a Specific Learning Disability in Basic Reading Skills and it is recommended that this be considered by his IEP team.

Behaviorally, Matthew has done well this school year and has made significant improvements. However, he continues to have difficulties with focusing and maintaining his attention to instruction in order to complete tasks. He continues to display the difficulties related to his health impairment, such as beginning and completing tasks in the time allotted and keeping his materials organized. Given these continued difficulties, it appears that Other Health Impairments continues to be a relevant identification, as well.

(*Id.* at 6–7 (emphasis added).)

On February 28, 2020, two days after Ms. Christensen finalized her diagnostic summary, teacher Erin Purdy shared the evaluation with G.F. and B.B. (Email, Docket No. 10-41.) In response, G.F. and B.B. requested that Matthew's IEP be revised to reflect that he had dyslexia. (Email, Docket No. 10-42 at 3–4; Email, Docket No. 10-43 at 1; Email, Docket No. 10-56 at 5-7.)

They expressed their frustration with the process to revise the IEP and obtain services for Matthew. (*Id.*) At the same time, Ms. Christensen was contacting various administrators and teachers within CMCSS for advice and resources to enable Northeast High School to implement support for Matthew's dyslexia. (Email, Docket No. 10-44; Email, Docket No. 10-53 ("I am hoping to get some clarification regarding the process necessary to get dyslexia specific support for a student (teacher) at Northeast High School.").) A meeting was set to take place on March 11, 2020 regarding Matthew's new dyslexia diagnosis, but G.F. felt it would not be productive and the meeting did not take place. (Email, Docket No. 10-54.)

The IEP team met the next month, on April 14, 2020, to revise Matthew's IEP and to undertake his triannual reevaluation to determine his eligibility under the IDEA.[16] (Ninth & Tenth Grade IEP Addendum, Docket No. 10-88; Eligibility Report, Docket No. 10-49.) For the first time, the IEP indicated that Matthew had a primary disability of "Specific Learning Disability" with a deficit area of "Basic Reading Skills, Math Calculation," though his secondary disability remained "Other – Health Impairments." (Docket No. 10-88 at 1.) The IEP meeting notice summarized the changes to the IEP and reasons for such changes as follows:

> Updated evaluations support a change in identification from OHI primary, to change to SLD – Basic Reading and Math Calculations Primary and Secondary Eligibility of OHI. Data collected from individual achievement tests and progress monitoring data support identification changes.
>
> It was necessary to update the present levels in the IEP to reflect the new testing/progress monitoring information. The new present levels necessitated a change in goals to address basic reading skills and remove the goals for fluency/comprehension as his needs are at a lower level at this time. His goals for math and transition will remain the same.

---

[16] On April 13, 2020, Matthew B.'s teacher, Erin Purdy, provided G.F. and B.B. with a copy of the draft IEP that would be discussed during the meeting the next day. (Email, Docket No. 10-60.) The meeting took place via Zoom videoconference because of the COVID-19 pandemic and resulting school closure. (IEP Meeting Letter, Docket No. 10-50 at 2.)

> The team agreed that Matthew would continue to have services in English II inclusion and that rather than be in Literacy Transitions AND Basic Reading Intervention class, that his needs would be best met in the Reading Intervention class and that he can get assistance with his English class during Eagle Time instead of the Literacy Transition class.
>
> The team requested that he have the use of the color overlay[17] in all his classes. No other accommodations were added or removed.

(IEP Meeting Letter, Docket No. 10-50 at 1.)

In particular, the PLOP section of the IEP was revised to include additional information from the assessments that Matthew took with Ms. Christensen that were detailed in her February 2020 report. (Docket No. 10-88 at 3–4.) The IEP contained a new reading goal, which was to read a list of 20 "nonsense words" with at least 90% accuracy, as well as a new classroom accommodation, which was the ability to use a color overlay to assist with reading. (*Id.* at 7.) Matthew was to no longer receive "Literacy Transition 2" services in a "pullout" setting but was to instead receive "reading intervention" services in a "pullout" setting starting in the fall of 2020 when he began the tenth grade. (*Id.* at 13.)

On the same day as the IEP meeting, Matthew's teacher, Erin Purdy, provided G.F. and B.B. with copies of documents related to the IEP meeting, and informed them that she would be teaching Matthew's reading class the following year. (Email, Docket No. 10-61.) She stated that teaching the class would be "new and unchartered territory" for her but expressed an enthusiasm

---

[17] "Colored overlays, one type of tinted filter, are plastic reading sheets tinted with color and placed over text to eliminate or alleviate a wide range of reading difficulties such as low reading rate, accuracy, and comprehension. . . . Colored filters are used in classrooms and homes to alleviate reading difficulties that are associated with learning disabilities including dyslexia." Tiffany Freeze Denton & James N. Meindl, *The Effect of Colored Overlays on Reading Fluency in Individuals with Dyslexia*, 9(3) Behav. Analysis in Prac. 191, 191 (2016), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC4999357/ [https://perma.cc/NE2G-UZGS].

22

for working with Matthew in this subject area. (*Id.*) The record indicates that Ms. Purdy had a relationship of trust with Matthew, G.F., and B.B.

When Matthew started the tenth grade in the fall of 2020, CMCSS put in place a Continuous Learning Individualized Plan ("CLIP") to address virtual instruction due to the COVID-19 pandemic. (CLIP, Docket No. 10-52.) However, the record indicates that Matthew preferred to attend classes in person, though he did attend some classes virtually. (G.F Test., Hr'g Tr. I, Docket No. 10-3 at 62 (242:7–16, 244:1–6).) Nevertheless, the CLIP stated that special education services would continue as written in the IEP, which included accommodations like extended time, reading aloud, a chill pass, and color overlays. (*Id.* at 2.)

During that fall semester, Matthew's father, B.B., expressed concerns to administrators, staff, and teachers at CMCSS about Matthew's progress. (Email, Docket No. 10-63.) B.B. stated that Matthew's teacher Erin Purdy was "doing her best" but could not be the only person responsible for Matthew's special education services, particularly those related to his dyslexia. (*Id.* at 2.) He asked CMCSS whether Matthew was receiving support for his dyslexia aside from the use of the FastBridge dyslexia screener; whether an after-school tutor had been scheduled; when the next IEP meeting would take place; and what the general plan was to provide Matthew with services. (*Id.*) In response to B.B.'s concerns and questions, Assistant Principal Carolyn Kennedy stated that Ms. Purdy was being trained for reading intervention using an Orton-Gillingham reading program, on which she had started to work with Matthew; that Matthew had done some after-school and in-school tutoring; and that an IEP meeting was being scheduled. (*Id.* at 1.) Around the same time, Matthew's construction and carpentry teacher, Jason Pennington, indicated in an email to Ms. Purdy that he had not "had a kid this bad at reading before." (Email, Docket No. 10-62.)

23

The IEP team next met soon thereafter on October 20, 2020 to create an addendum to the IEP for the remainder of the fall semester and a portion of the spring semester of Matthew's tenth grade. (Tenth Grade IEP Addendum, Docket No. 10-89.) The IEP revised the number of special education sessions per week. (*Id.* at 13.) Matthew received more minutes per week of special education services overall, though he had only two to three days of services per week for longer periods of time. (*Id.*)

At the beginning of Matthew's second semester of his tenth-grade year, he took additional screening assessments. (Email, Docket No. 10-65.) School psychologist Megan Christensen assessed his results and circulated an email detailing the number of weeks of intervention that would be needed for Matthew to meet his grade level goal, which she described as "extremely unreasonable" for several subjects. (*Id.* at 3.) She stated, "His scores are all over the place. There is no consistency at all." (*Id.* at 2.) In response, Dr. Patti Wilson, who was then serving as CMCSS's Response to Instruction and Intervention ("RTI[2]")[18] and Support Team Coordinator, suggested that some of Matthew's results may have signified "a possible lack of motivation . . . and/or the student not understanding the purpose of the assessment" and may have been due to Matthew's "known difficulties with sustained attention and persistence to task." (*Id.* at 1.)

The next and final IEP meeting for Matthew took place on February 3, 2021 and was to cover the rest of that year and a portion of the eleventh-grade year. (Tenth & Eleventh Grade IEP, Docket No. 90.) In advance of this meeting, G.F. and B.B. asked that Sarah McAfee, who served as a dyslexia specialist for CMCSS, be permitted to attend the meeting and become part of the IEP

---

[18] RTI[2] is an "academic three-tiered framework" to intervene when students first start to struggle and to subsequently address deficits in student learning so that students can avoid prolonged academic difficulties. *See About Responses to Instruction and Intervention (RTI[2]) in Tennessee*, TENN. DEP'T OF EDUC., https://www.tn.gov/education/districts/instruction/tdoe-rti2/rti2-rediect/rti-current-update.html [https://perma.cc/M3UW-L3KR].

24

team. (Email, Docket No. 10-67 at 7–8.) Despite an initial response that Ms. McAfee was free to attend, the record indicates that she was not present. (*Id.* at 7; S. McAfee Test., Hr'g Tr. I, Docket No. 10-3 at 45 (173:5–6); Text Messages, Docket No. 10-70.) Instead, CMCSS high school special populations coordinator Cassie Allen and consulting teacher Michelle Parks attended the meeting. (Docket No. 90 at 16.) In the PLOP section, the IEP referenced a FastBridge assessment from January 15, 2021 in which Matthew scored an 83% on a first-grade level. (*Id.* at 3.) The IEP updated one of his reading goals, which was to read a list of 20 "nonsense words" with at least 95%, rather than 90%, accuracy (*id.* at 6); removed his prior accommodation to use a color overlay (*id.* at 7); and included additional special education services for his new classes (*id.* at 13).

Shortly after the February 2021 IEP meeting, G.F. and B.B. removed Matthew from CMCSS. (G.F. Test., Hr'g Tr. I, Docket No. 10-3 at 63 (246:13–247:14).) He then began a homeschool program where he started to receive one-on-one instruction from a dyslexia-certified teacher at the expense of G.F. and B.B. (*Id.*) As of the time of the hearing, he was still receiving that instruction.

## C. Administrative Proceedings

On February 3, 2021, the same day as his final IEP meeting, Plaintiffs initiated an administrative due process complaint against CMCSS by filing a due process hearing request form.[19] (Due Process Hr'g Req. Form, Docket No. 10 at 4.) Plaintiffs then retained counsel and the parties attempted a mediation, but it was not successful. (Order, Docket No. 10 at 27.) On June 28, 2021, Plaintiffs amended their due process complaint to allege that CMCSS did not provide a

---

[19] Matthew's father, B.B., filed the due process hearing request form without the assistance of an attorney. (G.F. Test., Hr'g Tr. I, Docket No. 10-3 at 63 (246:10–12).) In the initial hearing request form, Plaintiffs alleged that CMCSS "failed to screen for dyslexia or identified causes of lack of progress from 2nd to 9th grade" and had not "provided appropriate or personalized intervention programs to enable progress." (Due Process Hr'g Req. Form, Docket No. 10 at 4.)

FAPE as required under the IDEA and violated the "child find" provision of the IDEA because CMCSS failed to fully consider and evaluate Matthew in all areas of suspected disability, including specific learning disability, beginning in his kindergarten year in 2009.[20] (Am. Due Process Compl., *id.* at 40.)

ALJ Michael T. Begley held a three-day hearing from May 17 to 19, 2022. Eight witnesses testified: (1) G.F., Matthew's representative; (2) B.B., Matthew's parent; (3) Megan Christensen, CMCSS school psychologist, who was qualified as an expert in school psychology; (4) Sarah McAfee, former CMCSS dyslexia specialist, who was qualified as an expert in dyslexia intervention; (5) Dr. Patti Wilson, CMCSS RTI[2] Coordinator and District Leader, who was qualified as an expert in school psychology and clinical psychology; (6) Erin Purdy, CMCSS teacher; (7) Samantha Winters, CMCSS teacher; and (8) Megan Pinchback, former special education teacher and Certified Academic Language Therapist and Licensed Dyslexia Therapist ("CALT"), who was qualified as an expert in special education for students with dyslexia.[21] (Hr'g Tr. I, Docket No. 10-3; Hr'g Tr. II, Docket No. 10-4; Hr'g Tr. III, Docket No. 10-5.)

On July 6, 2022, the ALJ issued a final order in which he determined that Plaintiffs had not met their burden to show that CMCSS "denied [Matthew] a FAPE during the 2020-2021 school year, because CMCSS did not violate its child find obligation or its obligation to create an

---

[20] The amended due process complaint also raised violations under: (1) Section 504 of the Rehabilitation Act of 1973, 34 C.F.R. § 104.35(a); (2) the state of Tennessee's "Say Dyslexia" law, Tenn. Code Ann. § 49-1-229; and (3) Title II of the Americans with Disabilities Act, 42 U.S.C. § 12132; 28 C.F.R. § 35.130(a). (Am. Due Process Compl., Docket No. 10 at 39–42.) However, the only claims presently before this Court are for violations of the IDEA. (Compl., Docket No. 1 at 11–15.)

[21] Megan Pinchback resides in Texas and not Tennessee. (M. Pinchback Test., Hr'g Tr. II, Docket No. 10-4 at 4 (290:13–15).) During the hearing, the ALJ ruled that she was admitted as an expert "but not to the extent that she has knowledge of practices in Tennessee." (*Id.* at 4–5 (291:4–292:12).)

individualized education program (IEP) that could provide M.B. of an educational benefit." (Final Order, Docket No. 10 at 213–28.) The ALJ made 31 specific findings of fact. (*Id.* at 214–19.) He also made several conclusions of law, including that CMCSS complied with its child find obligations as follows:

- "CMCSS complied with the child find provisions of the IDEA."

- "CMCSS promptly evaluated and identified [Matthew] as having an IDEA disability, which is all the law requires."

- "There is no requirement of designating a specific listed disability, only that [Matthew] be declared eligible for special education."

- "CMCSS timely evaluated [Matthew] and declared him eligible for special education services, which meets the IDEA child find requirements."

- "Once [Matthew] was declared eligible, he received services and accommodations according to his needs, including his reading deficits. Therefore, he was 'regarded as a child with a disability.' 20 U.S.C. § 1412(a)(3)(B)."

- "CMCSS complied with child find when [it] approved [Matthew] for special education services by initially categorizing him as OHI."

(*Id.* at 222–23.) The ALJ also concluded that CMCSS met the requirements for providing a FAPE as follows:

- "The record indicates that, during the two-year statutory period, the IEPs created were reasonably calculated to allow [Matthew] to make educational progress in light of his circumstances."

- "The COVID-19 shutdown had an adverse impact on [Matthew] and his progress in reading, as it did with many students."

- "The IEP was appropriate to serve [Matthew's] reading needs, and it contained reasonable accommodations for his education . . . ."

- "[T]he legal requirements to prove denial of a FAPE . . . have not been met."

- "Whether [Matthew's] IEPs in middle or elementary school provided him with a FAPE cannot be considered as they are outside of the statutory period."

- "Even if a remedy could go back to the duration of a purported violation, such a remedy is not triggered in this case since there is no initial violation within the statutory period."

(*Id.* at 225–27.)

After exhausting the appeals process at the administrative level, Plaintiffs appealed the ALJ's administrative decision to this Court. (Notice of Filed Appeal, *id.* at 325.)

## II.    STANDARD OF REVIEW

When a party files a federal complaint seeking judicial review in an IDEA action, the presiding court must review the administrative record, hear additional evidence at a party's request, and grant relief based on the preponderance of the evidence. 20 U.S.C. § 1415(i)(2)(C). This distinctive form of review has been described as a "modified *de novo*" standard, *Somberg v. Utica Cmty. Sch.*, 908 F.3d 162, 172 (6th Cir. 2018), under which the reviewing court is directed to "make an independent decision based on the preponderance of the evidence" while giving "due weight to the determinations made during the state administrative process." *Deal v. Hamilton Cnty. Bd. of Educ.*, 392 F.3d 840, 849 (6th Cir. 2004) (quoting *Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist., Westchester Cnty. v. Rowley*, 458 U.S. 176, 206 (1982)). However, a court should defer to the administrative findings only when educational expertise is relevant to those findings and the decision is reasonable. *Burilovich v. Bd. of Educ. of Lincoln Consol. Schs.*, 208 F.3d 560, 567 (6th Cir. 2000). This review requires the court to independently re-examine the evidence. *Deal*, 392 F.3d at 849 (quoting *Doe v. Metro. Nashville Pub. Schs.*, 133 F.3d 384, 387 (6th Cir. 1998)).

"[A]dministrative findings in an IDEA case may be set aside only if the evidence before the court is more likely than not to preclude the administrative decision from being justified based on the agency's presumed educational expertise, a fair estimate of the worth of the testimony, or both." *Burilovich*, 208 F.3d at 567. The party seeking relief from the administrative decision bears

the burden of proof. *Schaffer ex rel. Schaffer v. Weast*, 546 U.S. 49, 51 (2005) (holding that the burden of proof rests on the party seeking relief in the administrative phase).

Originally developed in the Supreme Court's *Rowley* decision, the Court's review is characterized as a two-part inquiry concerning: (1) whether the subject school district complied with the procedures set forth in the IDEA; and (2) whether the school district complied with the substantive provisions of the IDEA by providing an IEP that is "reasonably calculated to enable the child to receive educational benefits." *Deal*, 392 F.3d at 853–54. Although the IEP at issue must be "strictly review[ed] . . . for procedural compliance," a procedural violation does not constitute a denial of a FAPE unless it also produces substantive harm. *Id.* (citing *Knable v. Bexley City Sch. Dist.,* 238 F.3d 755, 764 (6th Cir. 2001)). And if the school system meets procedural requirements of the IDEA, "greater deference is to be afforded to" the school district's decision. *Dong v. Bd. of Educ. of Rochester Cmty. Sch.*, 197 F.3d 793, 800 (6th Cir. 1999).

In reviewing substantive compliance, courts are not permitted to "substitute their own notions of sound educational policy for those of the school authorities which they review." *Deal*, 392 F.3d at 854 (quoting *Rowley*, 458 U.S. at 206). Courts are also cautioned to "to avoid imposing their view of preferable educational methods" on the school districts since the "primary responsibility for formulating the education to be accorded a [child with disabilities], and for choosing the educational method most suitable to the child's needs, was left by the Act to state and local educational agencies in cooperation with the parents or guardian of the child." *Id.* (citing *Rowley*, 458 U.S. at 207).

29

### III. ANALYSIS

**A.    Plaintiffs' Claims**

Plaintiffs' lawsuit concerns an alleged "*decades-long* failure to identify Matthew's dyslexia and special learning disability." (Am. Due Process Compl., Docket No. 10 at 31 (emphasis in original).) Plaintiffs assert that CMCSS was aware that Matthew was at risk in almost all categories of reading as early as his first-grade year but failed to properly identify his specific learning disability of dyslexia until he was in the ninth grade, and, therefore, failed to "provide him an appropriate IEP, dyslexia-specific interventions or SLD interventions." (*Id.* at 39–41.) Accordingly, Plaintiffs allege that CMCSS (1) violated the "child find" provision of the IDEA because it failed to fully consider Matthew for all areas of suspected disability, and (2) failed to provide Matthew with a FAPE.[22]

**B.    Statute of Limitations**

The Court must first determine whether certain of Plaintiffs' claims are time barred under the IDEA's statute of limitations. The IDEA provides that a parent or agency must request a due process hearing "within 2 years of the date the parent or agency knew or should have known about the alleged action that forms the basis of the complaint." 20 U.S.C. § 1415(f)(3)(C). The parties do not agree on the date that Matthew's parents "knew or should have known about the alleged action that forms the basis of the complaint" and whether that date falls within the two-year statutory period (i.e., between February 3, 2019 and February 3, 2021). The Court must therefore determine when Plaintiffs "knew or should have known" that CMCSS failed to properly identify

---

[22] As detailed *supra*, note 20, Plaintiffs' amended complaint alleged violations under other state and federal laws, but the only claims presently before this Court are for violations of the IDEA. (Compl., Docket No. 1 at 11–15.)

Matthew's specific learning disability of dyslexia and whether that date occurred between February 3, 2019 and February 3, 2021.

In the ALJ's final order, he concluded as a matter of law that Matthew's IEPs from elementary and middle school could not be considered when analyzing whether CMCSS met the requirement for providing a FAPE because those IEPs were "outside of the statutory period." (Final Order, Docket No. 10 at 227.) The ALJ stated that he considered only those IEPs that were in place "during the two-year statutory period," though he did not provide any explanation for this decision or even specify the dates that the "statutory period" encompassed. (*Id.* at 225.) Presumably, the ALJ analyzed only the five IEPs that were in place from February 3, 2019 to February 3, 2021, which encompassed Matthew's second semester of eighth grade through his second semester of tenth grade.[23]

Plaintiffs argue that the ALJ erred in this conclusion. They assert that their February 3, 2021 request for a hearing was well within the two-year statute of limitations because they were not aware of CMCSS's failure to identify Matthew's specific learning disability until February 28, 2020 – which was less than one year before filing their request – when B.B. and G.F. received the results of Matthew's comprehensive evaluation from school psychologist Megan Christensen.[24]

---

[23] Those IEPs would include: (1) Eighth Grade IEP Addendum (Docket No. 10-86); (2) Ninth & Tenth Grade IEP (Docket No. 10-87); (3) Ninth & Tenth Grade IEP Addendum (Docket No. 10-88); (4) Tenth Grade IEP Addendum (Docket No. 10-89); and (5) Tenth & Eleventh Grade IEP (Docket No. 10-90).

[24] Plaintiffs also argue that two statutory exceptions apply: (1) specific misrepresentations by the school district that it resolved the problem forming the basis of the complaint, and (2) the school district's withholding of information from parents. 20 U.S.C. § 1415(f)(3)(D). Plaintiffs contend that CMCSS "misrepresented . . . that AD[H]D supports, alone, *without a teacher trained in delivering SLD/dyslexia supports*, were sufficient for Matthew." (Docket No. 16 at 12 (emphasis in original).) The Court finds no merit in this argument and therefore concludes that neither exception applies.

31

(Diagnostic Summary, Docket No. 10-40.) This evaluation indicated, for the first time, that Matthew showed signs of mixed dyslexia presentation. It also suggested, for the first time, that Matthew met criteria for a specific learning disability in "Basic Reading Skills," which should have been considered by his IEP team.

CMCSS, on the other hand, argues that Plaintiffs knew or should have known of the alleged failures to provide a FAPE prior to February 3, 2019, or outside of the statutory period. Therefore, it argues, the case should be dismissed for failure to timely request a hearing. CMCSS does not provide an exact "knew or should have known" date, but generally points to concerns that Matthew's parents raised about his reading progress as early as January 2012 when he was in the first grade.[25] CMCSS cites testimony from Dr. Patti Wilson where she stated that, prior to her initial January 2012 evaluation, she spoke with Matthew's parents who had concerns about his progress. She described those concerns as "overall academic, definitely with reading, and I believe also that he was starting to have some motivation issues with school and difficulties with self-efficacy." (P. Wilson Test., Hr'g Tr. II, Docket No. 10-4 at 45 (453:6–12).)

Generally, IDEA claims "accrue when the parents know or have reason to know of the injury or event that is the basis for their claim." *Hall v. Knott County Bd. of Educ.*, 941 F.2d 402, 408 (6th Cir. 1991), *cert. denied* 502 U.S. 1077 (1992) (quoting J. Wegner, *Educational Rights of Handicapped Children*, 17 J. LAW & EDUC. 625, 654 (1988)). Determining when a parent "knew or should have known" is a fact-specific inquiry. *See J.L. ex rel. J.L. v. Ambridge Area Sch. Dist.*, 622 F.Supp.2d 257, 266 (W.D. Pa. 2008).

---

[25] CMCSS makes a desultory argument that Matthew's guardian, G.F., began to have concerns about Matthew's dyslexia in the fall of 2018, which would be outside of the statutory period. (Docket No. 12 at 5.) However, the Court finds that a preponderance of the evidence shows that G.F. did not become aware of Matthew's deeper educational issues until the fall of 2019, at the earliest.

There is limited authority on how the "knew or should have known" date is determined. The Sixth Circuit Court of Appeals has not set forth an explicit standard to determine this date, but this Court finds that other circuit courts – namely the Second, Third, Fifth, and Eleventh Circuit Courts of Appeals – have provided well-reasoned and helpful analyses of this issue. *See, e.g.*, *Avila v. Spokane School Dist. 81*, 852 F.3d 936 (9th Cir. 2017); *G.L. v. Ligonier Valley Sch. Auth.*, 802 F.3d 601 (3d Cir. 2015); *Draper v. Atlanta Indep. Sch. Sys.*, 518 F.3d 1275 (11th Cir. 2008); *Somoza v. N.Y. City Dep't of Educ.*, 538 F.3d 106 (2d Cir. 2008). These courts have held that the discovery date stems from when parents know or have reason to know of "an alleged denial of a free appropriate public education under the IDEA," and not necessarily when they know or have reason to know that the school took or failed to take a particular action. *Avila*, 852 F.3d at 944–45 (citing *Somoza*, 538 F.3d at 114 (the "knew or should have known" date occurred when a parent viewed a child's rapid improvement in a new program); *Draper,* 518 F.3d at 1288). Put another way, the "knew or should have known" date is the date on which the plaintiffs have the facts necessary to know that they have been injured rather than the date when the injury first began. *See Draper*, 518 F.3d at 1288.

In *Draper*, a school system performed an evaluation of a student in 1998 when the student was eleven years old. However, the school system failed to assess the student for a specific learning disability even though he displayed signs of dyslexia. *Id.* at 1281. As a result of his evaluation, the student was placed in a restrictive classroom. *Id.* Five years later, in 2003, the school system reevaluated the student, which revealed that he did not have mild intellectual disabilities but, rather, a specific learning disability of dyslexia. *Id.* The student's IEP was then modified to include that specific learning disability. *Id.*

33

In the ensuing legal action, the parties disputed whether the IDEA's statute of limitations barred the student's claims regarding his placement in the restrictive classroom between the initial evaluation and reevaluation. *Id.* at 1288. The Eleventh Circuit sided with the student and reasoned that the student and his family "did not know enough to realize that [the student] had been injured by his misdiagnosis and misplacement" until 2003 when the family received the results of the reevaluation. *Id.* The *Draper* court wrote, "We decline the invitation of the School System to conclude, as a matter of law, that [the student's] family should be blamed for not being experts about learning disabilities." *Id.*

Other courts have agreed with or taken a similar approach to the Eleventh Circuit. For example, in *Avila*, the Second Circuit remanded a case back to the district court to address the statute of limitations under the "knew or should have known" standard. 852 F.3d at 945. In that case, a student underwent a psychological evaluation in 2006 and his mother signed forms agreeing with the results. *Id.* at 938. The Second Circuit stated that inquiry of the "knew or should have known" date did not end with the date that the form was signed. *Id.* at 944–45. Instead, the inquiry would need to go one step further to determine when the parent "knew or should have known" that the school system was denying the student a FAPE. *Id.* (citing *Somoza*, 538 F.3d at 114; *Draper*, 518 F.3d at 1288).

The Eastern District of New York summarized the approaches taken by the Second Circuit and Eleventh Circuit as follows:

> Courts within this [Second] Circuit have also applied an analysis similar to the Eleventh Circuit's analysis in *Draper*, holding that IDEA claims did not accrue until the family gained new information that made them aware of inadequacies in the student's prior special education program. . . . [A] lack of progress alone is insufficient to put parents on notice of an IDEA claim if the parents have no baseline to assess how much progress their child is capable of making. Instead, the courts found that the IDEA claims did not accrue until the family had reason to

know that their children might have made more progress if they had been given different interventions.

*K.H. v. New York City Dep't of Educ.*, No. 12–CV–1680 (ARR)(MDG), 2014 WL 3866430, at *19 (E.D.N.Y. Aug. 6, 2014) (citing *C.B. v. Pittsford Cent. Sch. Dist.*, No. 08–CV–6462 CJS (P), 2010 WL 1533392 at *18 (W.D.N.Y. Apr. 15, 2010) (claim accrued when parent hired educational consultant and first became aware that son's IEP failed to provide support for his "deficits in executive functioning"); *K.P. v. Juzwic*, 891 F.Supp. 703, 716–17 (D. Conn. 1995) (plaintiff discovered injury when entering new placement and becoming "aware that the education, services, and diminished expectations and goals" at his prior placement were inadequate")).[26]

The Court agrees with Plaintiffs that they did not know or have reason to know that the services provided by CMCSS were not adequately addressing Matthew's educational needs until February 28, 2020 when they received the results of Matthew's comprehensive evaluation by

---

[26] *See also A.W. v. Loudon County Sch. Dist.*, No. 3:20-cv-76, 2022 WL 4545609, at *9 (E.D. Tenn. Sept. 28, 2022) ("The earliest Plaintiffs could be said to have had *reason to know* of the irregularities in the documents was when LCSD first produced those documents in discovery for the administrative proceeding, in 2020.") (emphasis in original); *Downington Area Sch. Dist. v. D.S.*, No. 20-0892, 2022 WL 523563, at *8 (E.D. Pa. Feb. 22, 2022) ("Mere knowledge of the education a school is providing a child is insufficient; what parents must discover is that the education amounts to a violation.") (citing *E.G. v. Great Valley Sch. Dist.*, No. 16-5456, 2017 WL 2260707, at *8 (E.D. Pa. May 23, 2017)); *Brady P. v. Central York Sch. Dist.*, No. 1:16-CV-2395, 2018 WL 1367325, at *7 (M.D. Pa. Mar. 16, 2018) ("District courts within the Third Circuit applying the IDEA's discovery rule have generally focused on clear action or inaction by a school district sufficient to alert a reasonable parent that the child would not be appropriately accommodated."); *Jessica E. v. Compton Unified Sch. Dist.*, No. CV16–04356–BRO (MRWx), 2017 WL 2864945, at *6–7 ("Importantly, a plaintiff's awareness of underlying facts does not necessarily mean the plaintiff 'knew or had reason to know' of the basis of their claims because some issues require specialized expertise a parent cannot be expected to have.") (citing *Avila v. Spokane School Dist. 81*, 852 F.3d 936, 944 (9th Cir. 2017) (internal quotation marks and brackets omitted); *Damarcus S. v. Dist. of Columbia*, 190 F.Supp.3d 35, 45 (D.D.C. 2016) ("[T]he Hearing Officer's blanket finding that all deficiencies should be immediately recognized puts too great a burden on parents, who often lack the knowledge to understand the complexities of educating disabled children. . . . Instead, the inquiry should depend upon the particular deficiency asserted, and the parent's ability to recognize it.") (citations omitted).

35

school psychologist Megan Christensen.[27] Up to that point, they knew that Matthew's reading was not progressing and they had only recently started to have concerns about Matthew potentially being diagnosed with dyslexia.[28] However, Matthew's continued lack of progress with reading, albeit frustrating, was not enough to put them on notice of an IDEA claim because they had "no baseline to assess how much progress [Matthew was] capable of making" until they received the evaluation results. *K.H.*, 2014 WL 3866430 at *19. It was only when Matthew and his parent and guardian received the evaluation results that they had reason to suspect that his reading issues and lack of progress were due to a lack of support for his dyslexia. As G.F. testified, after receiving the evaluation results, Matthew had reason to believe he was "not stupid." (G.F. Test., Hr'g Tr. I, Docket No. 10-3 at 60 (233:11–14).) This new evaluation gave Matthew's family a "baseline to assess how much progress [Matthew was] capable of making" and "made them aware of inadequacies in [Matthew's] prior special education program." *K.H.*, 2014 WL 3866430 at *19.

---

[27] With respect to the "child find" claim, Plaintiffs argue that even if the alleged violation in the eighth grade (or any prior grade) was untimely, this violation occurred again in the ninth and tenth grades and therefore "repeated well into the limitations periods." (Docket No. 16 at 10–11 (citing *Indep. Sch. Dist. No. 283 v. E.M.D.H.*, 960 F.3d 1073, 1083 (8th Cir. 2020)).) The Court does not express an opinion on this argument because it finds that Plaintiffs' child find claim fails, in part, for separate reasons, as detailed in the next section.

[28] Evidence in the record indicates that Matthew's guardian, G.F., first had concerns about a potential dyslexia diagnosis in the fall of 2019, only a few months before Ms. Christensen evaluated Matthew. (G.F. Test., Hr'g Tr. I, Docket No. 10-3 at 56–57 (221:1–222:10).) However, the fact that G.F. was aware that Matthew exhibited signs of dyslexia does not mean that Plaintiffs "knew or should have known" of their claim in the fall of 2019. *Hall v. Knott County Bd. of Educ.*, 941 F.2d 402, 408 (6th Cir. 1991). To hold otherwise would blame parents "for not being experts about learning disabilities" and would penalize parents for taking an active interest in their children's learning issues. *See Draper v. Atlanta Indep. Sch. Syst.*, 518 F.3d 1275, 1288 (11th Cir. 2008). In fact, the record indicates that CMCSS may never have evaluated Matthew for dyslexia if G.F. had not independently researched the issue and requested on January 23, 2020 that a test take place. (Email, Docket No. 10-35.) As the evaluation itself states, Matthew was referred by his parents who "wanted to explore evaluations specific to dyslexia." (Docket No. 10-40 at 1.) Regardless, even if the "knew or should have known" date was in the fall of 2019, Plaintiffs' claims would still fall within the two-year statutory period.

After Plaintiffs received the results and were aware that Matthew evidenced deficits that suggested a "mixed dyslexia presentation," they began to make requests that his IEP be modified to include dyslexia and that services for dyslexia be provided. (Email, Docket No. 10-42 at 3–4; Email, Docket No. 10-56 at 5–7.) Just as the family in *Draper* "did not know enough to realize that Draper had been injured by his misdiagnosis and misplacement" until they received new evaluation results indicating that he had dyslexia, Matthew's family "did not know enough" to appreciate that CMCSS's alleged failure to diagnosis Matthew with dyslexia and support him for that specific learning disability may have resulted in the denial of a FAPE. This Court finds compelling Plaintiffs' argument that "until 2020, [Plaintiffs were] led to believe that AD[H]D supports, alone, without need for the direct support of a dyslexia-trained teacher in mixed type presentation, were sufficient" for Matthew. (Docket No. 16 at 9.) Plaintiffs had no reason to believe that Matthew's reading issues were a result of dyslexia because they had no ability as laypersons to determine that Matthew had dyslexia. *See Damarcus S.*, 190 F.Supp.3d at 45. It was only when they received the evaluation results that they "had reason to know that [Matthew] might have made progress if [he] had been given different interventions." *K.H.*, 2014 WL 3866430 at *19.

The Court is not persuaded by CMCSS's argument that Plaintiffs "'knew or should have known' of their claim of alleged deficiencies in the education of Matthew B. well prior to 2019." (Docket No. 12 at 5.) First, this argument is vague and unspecific. CMCSS does not point to a specific event or date. Instead, it points to generalized concerns from Matthew's parents regarding his reading progress. The closest CMCSS comes to an explicit date is testimony from Dr. Patti Wilson that Matthew's parent expressed serious worries about his reading during a routine parent interview prior to Matthew's initial 2012 evaluation. (*Id.*) However, this argument wrongly frames Plaintiffs' "alleged deficiencies" as being about Matthew's "reading issues" when they are,

instead, about CMCSS's failure to properly identify Matthew's specific learning disability of dyslexia. (*Id.*) Although Plaintiffs allege that CMCSS's violations date back to Matthew's first grade year, their claims focus on the school district's failure to provide appropriate IEPs and interventions based on Matthew's dyslexia. As Plaintiffs allege in their Amended Due Process Complaint, "[b]y first grade, [CMCSS] had actual knowledge that Matthew met criteria for a specific learning disability, yet it failed to provide him an appropriate IEP, dyslexia-specific interventions or SLD interventions, and FAPE." (Docket No. 10 at 40–41.)

The Court has accorded "due weight" to the ALJ's conclusion that Matthew's IEPs from elementary and middle school are "outside of the statutory period," but has nevertheless made "an independent decision based on the preponderance of the evidence" that this conclusion was in error. The Court has accorded less weight to the ALJ's conclusion on this particular issue because educational expertise is less relevant to these findings and because the ALJ did not provide explicit analysis on this issue. *See Burilovich*, 208 F.3d at 567. In the decision, the ALJ did not determine the date on which Plaintiffs knew or should have known about the action that forms the basis of their complaint. Further, the ALJ did not explain his reasoning for limiting his review to the two years prior to the date on which Plaintiffs requested an impartial due process hearing. Within the ALJ's opinion, there is no clear analysis regarding the statute of limitations or the discovery rule, nor is there a discussion of the arguments forwarded by either party on these issues. Rather, the ALJ made a cursory determination that Matthew's IEPs from elementary and middle school could not be considered for a determination of the FAPE issue because they are "outside of the statutory period." Accordingly, the Court finds that the ALJ erred in his analysis of the statute of limitations issue.

In light of this error, it is not possible for this Court to conduct a meaningful review of the ALJ's determination that "the legal requirements to prove denial of a FAPE . . . have not been met" because the ALJ failed to develop factual findings and legal conclusions with respect to Plaintiffs' claims based upon the period prior to February 3, 2019. (Final Order, Docket No. 10 at 227.) The Administrative Record reflects that the ALJ made only limited factual findings and legal conclusions with respect to Plaintiffs' claims that CMCSS failed to provide Matthew with a FAPE. Under these circumstances, this Court finds it appropriate and necessary to remand the matter to the ALJ for further administrative adjudication regarding whether any of Plaintiffs' claims based upon or related to the IEPs that were in place period prior to February 3, 2019 are meritorious. If the ALJ finds it necessary to consider additional evidence in making his findings regarding the alleged IDEA violations, then the ALJ should hear more evidence on the relevant issues from both parties. The ALJ shall fully consider Plaintiffs' claims that CMCSS failed to provide Matthew with a FAPE based upon the period prior to February 3, 2019 and shall fashion relief as appropriate under applicable laws.

**C.      Child Find**

Although the Court remands this matter to the ALJ for further determinations regarding whether CMCSS failed to provide Matthew with a FAPE, the Court, nevertheless, makes findings regarding whether CMCSS committed a procedural violation of the "child find" provision of the IDEA.

The IDEA imposes a "child-find" requirement on the states: their schools must have policies and procedures in place to identify, locate, and evaluate children with disabilities who need special education and related services. 34 C.F.R. § 300.111(a)(1). Plaintiffs argue that CMCSS's failure to "be aware of, and serve" Matthew's dyslexia constituted a violation of the

IDEA child find requirement. (Docket No. 13 at 17.) Plaintiffs appear to allege that CMCSS's failure to label Matthew as having dyslexia is not only evidence of CMCSS's failure to provide Matthew with a FAPE, but also a violation of the IDEA's child find provision. Plaintiffs do not explicitly state whether they believe this child find violation is procedural, substantive, or both.

In his final order, the ALJ concluded that CMCSS complied with child find because it "promptly evaluated and identified [Matthew] as having an IDEA disability, which is all the law requires. There is no requirement of designating a specific listed disability, only that [Matthew] be declared eligible for special education." (Final Order, Docket No. 10 at 222.) The ALJ cited the IDEA's statutory text to support this conclusion:

> Nothing in this chapter requires that children be classified by their disability so long as each child who has a disability listed in section 602 [20 U.S.C. § 1401], and who, by reason of that disability, needs special education and related services is regarded as a child with a disability under this subchapter.

(*Id.* (quoting 20 U.S.C. § 1412(a)(3)(B).) *See also* 34 C.F.R. § 300.111 ("Child find."). This Court largely agrees.

Under the child find provision of the IDEA, states are not required to classify students into a specific category; rather, "the focus of the mandate is on adequacy of services." *Pohorecki v. Anthony Wayne Local Sch. Dist.*, 637 F.Supp.2d 547, 557 (N.D. Ohio 2009). Put another way, the IDEA "charges a school with the responsibility of developing an appropriate education, not with coming up with a proper label." *Id.* (quoting *Heather S. v. Wisconsin*, 125 F.3d 1045, 1055 (7th Cir. 1997)). To establish a violation of the child-find requirement, a plaintiff "must show that school officials overlooked clear signs of disability and were negligent in failing to order testing, or that there was no rational justification for not deciding to evaluate." *M.G. v. Williamson Cnty. Schs.*, 720 F. App'x 280, 284 (6th Cir. 2018) (quoting *Bd. of Educ. of Fayette Cnty. v. L.M.*, 478 F.3d 307, 313 (6th Cir. 2007)).

40

To support its position that CMCSS violated the "child find" provision of the IDEA, Plaintiffs point to *D.C. v. Klein Indep. Sch. Dist.*, 860 F. App'x 894 (5th Cir. 2021). They assert that the ALJ, district court, and circuit court in the *D.C.* case "all held that the [school's] delay [to evaluate a student] constituted a Child Find violation because 'an IEP must provide services that address all of the child's disabilities; significant services addressing one disability are not enough if another disability is left unaddressed.'" (Docket No. 13 at 17 (quoting *D.C.*, 860 F. App'x at 903).) Although it is true that an IEP must provide *services* to address all disabilities, the *D.C.* court did not hold that a failure to provide those services equates to a child find violation.

Instead, the *D.C.* court analyzed "(1) the date the child find requirement [was] triggered due to notice of a likely disability; (2) the date the child find duty was ultimately satisfied; and (3) the reasonableness of the delay between these two dates." *D.C.*, 860 F. App'x at 900 (quoting *Spring Branch Indep. Sch. Dist. v. O.W. ex rel. Hannah W.*, 961 F.3d 781, 793 (5th Cir. 2020)). After determining that the district court had not erred in its holding that the school violated the child find mandate because it unreasonably delayed the student's evaluation by at least four months, *id.* at 900–03, the court then separately reviewed whether the IEP at issue was adequate, *id.* at 903–07.

In a case from this district, Magistrate Judge Alistair Newbern thoroughly and thoughtfully analyzed whether a school district's classification of a student as "other health impaired" but not as a more specific disability violated the IDEA, and specifically the child find provision. *C.A. v. Williamson Cnty. Bd. of Educ.*, No. 3:19-cv-00272, 2021 WL 3883954, at *11–12 (M.D. Tenn. Aug. 31, 2021). In *C.A.*, the school district conducted a triennial reevaluation of a student and found that the student met eligibility criteria for "other health impaired" but not for "emotional disturbance." *Id.* at *11. The plaintiffs argued that the school district's failure to classify the student

41

with "emotional disturbance" violated the IDEA. *Id.* In response, the school district argued, among other things, that "failing to assign [the student] an emotional disturbance classification 'had no impact on the services and supports offered to [the student] since he remained eligible for special education services as a student with an OHI.'" *Id.*

To evaluate the plaintiffs' claims, Judge Newbern looked to the statutory language of the IDEA, which provides that the children need not be "classified by their disability" so long as each child who has a disability is regarded as a child with a disability. *Id.* (citing 20 U.S.C. § 1412(a)(3)(B)). In light of that provision, Judge Newbern determined that the plaintiffs did not carry their burden to show by a preponderance of the evidence that the school district violated IDEA procedures by declining to classify the student with emotional disturbance in addition to OHI. *Id.* (citing *Heather S.*, 125 F.3d at 1055 ("The IDEA charges the school with developing an appropriate education, not with coming up with a proper label with which to describe [a student's] multiple disabilities."); *Pohorecki*, 637 F. Supp. 2d at 557 ("The very purpose of categorizing disabled students is to try to meet their educational needs; it is not an end to itself.")). The court stated:

> There is no dispute that [the school district] regarded [the student] as a child with a disability under the IDEA as a result of the 2016 reevaluation based on his OHI classification; the fact that [the school district] did not also classify [the student] with emotional disturbance does not change its obligation to craft an appropriate IEP for [the student] based upon his educational needs. None of the authority on which [plaintiffs] rely provides otherwise because, unlike this case, each case [plaintiffs] cite involved a determination that a student was not disabled at all within the meaning of the IDEA.

*Id.* at *12 (citations omitted). Judge Newbern further explained that, even if the plaintiffs had shown that the school district committed a *procedural* violation by failing to classify the student with emotional disturbance, whether that failure was a *substantive* violation of the IDEA was a separate question. *See id.* at *13. Because plaintiffs did not show by a preponderance of the

evidence that there was a "connection between the lack of an emotional disturbance classification and specific deficiencies" in the IEP at issue, neither a procedural violation of the child find provision nor a substantive violation of the IDEA had occurred. *Id.*

With respect to a *procedural* violation, the child find provision of the IDEA is concerned with whether a school district identifies children with disabilities in a timely manner. Courts often analyze a school district's reasons for failing to order an evaluation for a student, or, if one is ordered, the timing of that evaluation. The child find provision is less concerned, however, with whether subsequent IEPs are adequate. This analysis is more relevant to a *substantive* analysis of whether a student was afforded a FAPE.

Here, there is no dispute that CMCSS regarded Matthew as a child with a disability under the IDEA because of his initial 2012 evaluation based on his OHI classification. There is no dispute that CMCSS provided Matthew with services pursuant to his OHI classification and created IEPs for Matthew from February 2012 to February 2021 when he left the school system. Plaintiffs have failed to show that Matthew was not "regarded as a child with a disability."[29] Instead, Plaintiffs' criticisms are with the services that Matthew received as a "child with a disability," or whether CMCSS committed a substantive violation of the IDEA by failing to provide Matthew with a FAPE. For all these reasons, the Court finds that CMCSS did not commit a *procedural* violation of the child find provision of the IDEA.

However, the question of whether Plaintiffs have shown that CMCSS's failure to classify Matthew with dyslexia caused *substantive* harm – i.e., whether there was a "connection between the lack of a[] [dyslexia] classification and specific deficiencies" in the IEPs at issue, *C.A.*, 2021

_____

[29] Plaintiffs do not address the IDEA's provision that a child does not have to be "classified by their disability" as long as the child is "regarded as a child with a disability." 20 U.S.C. § 1412(a)(3)(B).

WL 3883954 at *13 – is remanded to the ALJ for further consideration in light of this Court's finding that the statute of limitations does not bar the ALJ from considering all of Matthew's IEPs. As detailed above, the Administrative Record reflects that the ALJ made only limited factual findings and legal conclusions with respect to Plaintiffs' claims that CMCSS failed to provide Matthew with a FAPE. This Court finds that Plaintiffs' claims that CMCSS *substantively* violated the IDEA's child find provision are, at their core, allegations that CMCSS failed to provide Matthew with a FAPE. Accordingly, this Court finds it appropriate and necessary to remand the matter to the ALJ for further administrative adjudication.

## IV.    RECOMMENDATION

Based on the foregoing, it is respectfully RECOMMENDED that:

(1)    Plaintiffs' motion for judgment on the administrative record (Docket No. 13) be GRANTED IN PART AND DENIED IN PART as detailed above;

(2)    Defendant's motion for judgment on the administrative record (Docket No. 11) be GRANTED IN PART AND DENIED IN PART as detailed above;

(3)    This matter be REMANDED to the Administrative Law Judge for further findings and conclusions consistent with this Report and Recommendation; and,

(4)    This case be administratively closed pending the outcome of the administrative proceedings, but that it may be reopened on the motion of either party at the conclusion of those further administrative proceedings.

ANY OBJECTIONS to this Report and Recommendation must be filed with the Clerk of Court within fourteen (14) days of service of this Report and Recommendation and must state with particularity the specific portions of this Report and Recommendation to which objection is made. *See* Fed. R. Civ. P. 72(b)(2); Local Rule 72.02(a). Failure to file specific written objections within

the specified time can be deemed to be a waiver of the right to appeal the District Court's order. *See Thomas v. Arn*, 474 U.S. 140 (1985); *Cowherd v. Milton*, 380 F.3d 909, 912 (6th Cir. 2004) (en banc). Any responses to objections to this Report and Recommendation must be filed within 14 days of the filing of the objections. *See* Fed. R. Civ. P. 72(b)(2); Local Rule 72.02(b).

Respectfully submitted,

BARBARA D. HOLMES
United States Magistrate Judge